[Cite as *In re Estate of Marsh*, 2011-Ohio-5554.]

IN THE COURT OF APPEALS FOR GREENE COUNTY, OHIO

IN THE MATTER OF THE ESTATE    :
OF CLARA A. MARSH, DECEASED

             :    C.A. CASE NO. 2010 CA 78

             :    T.C. NO.  10416WC-09-86

             :    (Civil appeal from Common
                   Pleas Court, Probate Division)
             :

             :

. . . . . . . . . .

**O P I N I O N**

Rendered on the   28th   day of   October  , 2011.

. . . . . . . . . .

ARTHUR R. HOLLENCAMP, Atty. Reg. No. 0020528, 130 West Second Street, Suite 2107, Dayton, Ohio 45402
    Attorney for Appellant

MATTHEW C. SORG, Atty. Reg. No. 0062971, 2700 Kettering Tower, Dayton, Ohio 45423
    Attorney for Appellees

. . . . . . . . . .

FROELICH, J.

{¶ 1} Elaine Grayson appeals from a judgment of the Greene County Court of

Common Pleas, Probate Division, which granted summary judgment to Richard and Martha

Marsh in Elaine's will contest action.[1]  For the following reasons, the trial court's judgment will be affirmed in part and reversed in part, and the case remanded for further proceedings.

I

{¶ 2}  Elaine Grayson and Richard Marsh are the surviving children of Clara Marsh, who died on March 26, 2008.  Elaine has been married to John Grayson since 1966. Richard and Martha (whose nickname is Sam) married in 2005.  During the relevant time period, Clara lived in Xenia near the Graysons; the Marshes reside in Willoughby near Cleveland.

{¶ 3}  On January 26, 1996, Clara executed a will ("the 1996 will"), which left her estate to her husband, if he were alive, and to her children equally, if her husband predeceased her.  Clara's husband, LeRoy, subsequently died in 1996.  In 2003, Clara sold her home and moved into a condominium purchased with proceeds from the sale of the house and additional money contributed by her son, Richard.   After the purchase, Clara executed a quit claim deed that made Richard and Clara joint tenants with right of survivorship.

{¶ 4}  In January 2004, Clara wrote a letter to her children, indicating that "[s]ince the purchase of my condo, I find it necessary to write a new will."  The letter set forth her wishes regarding funeral arrangements and the disposition of her property.  Of note, the letter stated: "I am sure you know that if it were not for Richard I would not be in this Condominium today.  He wanted it for me as much as I and he did all he could do to get it. I am most grateful.  Richard and I own this house equally.  There is a recorded document (a

---

[1] Because several family members share the same last name, we will refer to the parties by their first names.

survivorship deed) that leaves the condo to Richard at my demise.  It is only right that I do this for him.  He has done everything he could (physically and financially) because he wanted this move as much as I.  I sincerely hope that this will not cause any friction between my children."  The letter was not witnessed, and neither party has claimed that this letter qualified as a valid will under Ohio law.  See R.C. 2107.03 (requiring at least two witnesses to create a valid will).

{¶ 5}  In January 2006, Clara moved to Elmcroft Assisted Living, and the condominium was listed for sale.   The Graysons and the Marshes disagreed about how the proceeds of the sale should be distributed.  Richard informed the Graysons that Clara wanted the proceeds to be placed in a joint survivorship account in Clara and Richard's names.  The Graysons believed that Clara's proceeds should be placed in her (Clara's) existing Merrill Lynch account.  During July 2006, the Graysons and Marshes exchanged numerous e-mails relating to Clara's assets and whether she needed a guardian.

{¶ 6}  On July 26, 2006, John (Clara's son-in-law) filed a petition for guardianship of Clara in the probate court, alleging that Clara had Alzheimer's disease and dementia. John acknowledged in his deposition that the guardianship proceeding mostly "was about determining where Clara's proceeds went, whether she kept control of them or they [were] given to someone else."  Richard opposed John's petition and sought to be appointed Clara's guardian.  It is clear that there was friction between Richard and the Graysons in 2006 prior to the filing of John's petition and that the relationship deteriorated after its filing.

{¶ 7}  On August 19, 2006, unbeknownst to the Graysons, Clara executed a handwritten will ("the 2006 will").  This document stated, in its entirety: "Because of all the

legal problems Elaine and John are causing, I am afraid my final wishes will be ignored. To prevent this from happening , this is my new will: I leave <u>everything</u> to my son Richard and his wife Sam. I love you all very much." (Emphasis in original.) The will was signed and dated by Clara. On September 1, 2006, Pamela E. Gaylor and Patricia B. Fuller, the priest and secretary, respectively, of Christ Episcopal Church in Xenia, signed the document under the handwritten sentence (written by Gaylor), "Clara Marsh is doing this of her own free will."

{¶ 8} In approximately late April 2007, Clara moved to the Alzheimer's unit at Elmcroft, and she remained there for approximately one month until she fell and broke her hip, requiring surgery. Following her hospital stay, Clara moved to Greene Oaks Nursing Home, and soon was placed in the Alzheimer's unit there. Clara died on March 26, 2008.

{¶ 9} On March 27, 2008, John filed the 1996 will with the probate court. The will was admitted, and John was appointed executor of Clara's estate in accordance with that will. On May 2, 2008, Richard filed an application to probate the 2006 will. After a hearing, the 2006 will was admitted to the probate court, and Richard was appointed administrator of Clara's estate.

{¶ 10} Elaine, Clara's daughter, subsequently filed this action against Richard and Martha, challenging the validity of the 2006 will. Elaine claimed that Clara lacked the requisite testamentary capacity to execute the 2006 will and that Richard had exerted undue influence upon Clara. Richard and Martha moved for summary judgment on Elaine's claims, and Elaine opposed the motion. After considering the parties' submissions, the trial court found no genuine issues of material fact and granted Richard and Martha's summary

judgment motion.

{¶ 11} Elaine appeals from the trial court's judgment. In her sole assignment of error, Elaine claims that the trial court erred in granting Richard and Martha's motion for summary judgment.

II

{¶ 12} "The purpose of a motion for summary judgment is to test whether genuine issues of material fact exist such that a trial is necessary to resolve those issues." *Abroms v. Synergy Bldg. Sys.*, Montgomery App. No. 23944, 2011-Ohio-2180, ¶34. Although the existence of testamentary capacity and undue influence are questions of fact, "disposition by summary judgment is appropriate in a will contest." *Bustinduy v. Bustinduy* (Dec. 18, 1998), Champaign App. No. 98-CA-21.

{¶ 13} Summary judgment should be granted only if no genuine issue of material fact exists, the moving party is entitled to judgment as a matter of law, and reasonable minds can come to but one conclusion, which is adverse to the nonmoving party. Civ.R. 56; *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 66.

{¶ 14} Upon a motion for summary judgment, the moving party bears the initial burden of showing that no genuine issue of material fact exists for trial. *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 292-93. Once the moving party satisfies its burden, the nonmoving party may not rest upon the mere allegations or denials of the party's pleadings. Id.; Civ.R. 56(E). Rather, the burden then shifts to the non-moving party to respond, with affidavits or as otherwise permitted by Civ.R. 56, setting forth specific facts which show that there is a genuine issue of material fact for trial. Id. Throughout, the evidence must be

construed in favor of the non-moving party.   Id.

{¶ 15} An appellate court reviews summary judgments de novo, meaning that we review such judgments independently and without deference to the trial court's determinations.   *Koos v. Cent. Ohio Cellular, Inc.* (1994), 94 Ohio App.3d 579, 588.

III

{¶ 16} First, Elaine claims that the trial court erred in granting summary judgment to Richard and Martha on the issue of testamentary capacity.

{¶ 17} R.C. 2107.02 provides that "[a] person of the age of eighteen years, or over, sound mind and memory, and not under restraint may make a will."   "A testator has capacity to make a will when he has sufficient mind and memory (1) to understand the nature of the business in which he is engaged, (2) to comprehend generally the nature and extent of his property, (3) to hold in his mind the names and identities of those who had natural claims upon his bounty, and (4) to be able to appreciate his relation to members of his family."   *In re Estate of Worstell v. Harold Todd, Inc., ex rel. Estate of Worstell*, Montgomery App. No. 19133, 2002-Ohio-5385, ¶17, citing *Niemes v. Niemes* (1917), 97 Ohio St. 145.

{¶ 18} "Since the testamentary capacity is determined as of the time of the execution of the will, evidence of the testator's mental and physical condition, both at the time of making the will, and within a reasonable time before and after its execution, is admissible as throwing light on testamentary capacity at the time of the execution."   *Bustinduy*, supra, quoting 33 Ohio Jur.3d (1997), Decedent's Estates, Section 1153.

{¶ 19} In granting summary judgment to Richard and Martha on the issue of

testamentary capacity, the trial court reasoned:

{¶ 20} "There appears to be acceptance of the facts that the decedent was diagnosed with Alzheimer's by Dr. Byers and was found to struggle with 'significant cognitive impairments' by Dr. Kraus. Dr. Byers felt the decedent needed 'help' and Dr. Kraus felt she needed 'assistance.' Neither, however, precluded her ability to generally continue to function in a fairly normal manner. There were many things she could continue to do. Also neither addressed the criteria for testamentary capacity and thus did not preclude the possibility.

{¶ 21} "It also is not contested that there were instances where the decedent evidenced short term memory loss, forgetfulness, the inability to continue to play cards and to operate her television.

{¶ 22} "On the other hand, Defendants point out at page 4 of their motion that the Plaintiff and her husband admit in depositions that the decedent understood that she was making her will, that she was aware of the general nature and extent of her property, that she knew her family and that she appreciated her relationship with them. This, of course, being the legal test for testamentary capacity.

{¶ 23} "The Court believes it is also pertinent to this issue that the decedent penned her own will which appears in form, language and substance to have been written by someone who knew what she was doing.

{¶ 24} "The Court, therefore, believes the Defendants' motion for summary judgment on the issue of testamentary capacity should be granted."

{¶ 25} Upon an independent review of the evidence submitted by the parties,

viewing that evidence in the light most favorable to Elaine, we find no fault with the trial court's conclusion. John and Elaine testified during their depositions that they saw Clara almost every day. Elaine testified that, in November 2006 (two months after the witnessing of the 2006 will), Clara knew who Elaine, John, Richard and Martha were, and Clara was aware of the guardianship proceeding. Elaine stated that Clara knew of the sale of the condominium in August 2006, and she was aware of the furnishings that she owned, that she had some personal property in storage, and that she had investments, although she may not have known the total amount of those investments.

{¶ 26} John testified that, in November 2006, Clara understood her relationship to him, Elaine, and their daughter, Leslie, as well as to Richard and Martha. He indicated that Clara was aware of the ongoing legal actions regarding the guardianship petition and the sale of the condominium and of the feud between Richard and the Graysons. Clara also knew that she had proceeds from the sale of the condominium and was generally aware that she had assets at Merrill Lynch which were under John's care, custody, and control; although Clara was likely unaware that the Merrill Lynch money was held in several mutual funds, John did not think Clara was incompetent for that reason. And, Clara knew that she had authorized John to act for her under a power of attorney, although there was evidence that she did not recall signing a document to that effect.

{¶ 27} In addition, Reverend Gaylor, who witnessed Clara's acknowledgment of her will, testified that Clara came into the church office on September 1, 2006, and said that she had something for Reverend Gaylor to read. Reverend Gaylor paraphrased the conversation, saying: "She said I have something to read to you. I have something for you

to read. This is a new Will. I've changed my Will. I would like for you to read this and sign it." Reverend Gaylor indicated that she asked Clara to sit down, she read the document, and recommended that Clara talk with an attorney. Clara had responded, "I will do that later, but right now I want you to sign this." Clara repeated to Gaylor and to Fuller that she wanted to them to sign her new will. In a private conversation, Reverend Gaylor again asked Clara whether she was "certain this is really what you want to do." Gaylor and Fuller signed the will. The will, on its face, indicates that Clara knew her children and the "legal problems" that were occuring, and her statements to Reverend Gaylor and Fuller constitute further evidence that she understood what she was doing when she had the 2006 will witnessed.

{¶ 28} We recognize, as did the trial court, that Elaine presented evidence that Clara was evidencing signs of dementia, including short term memory loss, and that her ability to manage her medications, bills, and schedule was becoming more limited. Dr. Byers, Clara's physician, completed a Statement of Expert Evaluation for the guardianship proceeding on July 27, 2006, which stated that Clara was experiencing progressive dementia, Alzheimer's type and that "[i]t would be in her best interest to have assistance." Dr. Byers stated that Clara needed help with "bills, etc." Dr. Byers believed that Clara's children would "always act in her best interest."

{¶ 29} Clara was evaluated in October 2006 by Dr. George Kraus, a psychologist, as part of the guardianship proceeding. Dr. Kraus concluded:

{¶ 30} "It appears that in many ways, Mrs. Marsh is carrying on many of her Activities of Daily Living with skill and success. It appears that while she cannot live a

fully independent lifestyle that Mrs. Marsh feels fairly well adjusted at her place of residence, given the constraints of living in an assisted living facility. Despite this, however, it appears that Mrs. Marsh does need assistance with managing her medications and with other Instrumental Activities of Daily Living.

{¶ 31} "*** Although [Mrs. Marsh's] memory scores are consistent with what would be expected for a person with her IQ scores, given her education level there does appear to be evidence of significant global neurocognitive impairment. Mrs. Marsh's score on the Hopkins Competency Assessment Test also indicated significant difficulty understanding and thinking about medical decisions. Her level of decline in this regard was indicative of someone who cannot make medical decisions for themselves.

{¶ 32} "I believe there are many activities for which Mrs. Marsh is competent. However, regarding her ability to manage her own finances, manage her own medical decision making, and manage her own life decisions regarding her place of residence, I believe there is sufficient evidence that Mrs. Marsh is not competent to manage her own affairs."

{¶ 33} Elaine and John also described some impairments in Clara's management of her day-to-day activities, as well as in such activities as playing cards or writing letters. Elaine indicated that Clara "declined rapidly" in 2007. John similarly stated that Clara had some "stairstep" declines starting in the summer of 2006, but had "some very significant ones" in 2007.

{¶ 34} Even accepting the evidence of Clara's dementia/Alzheimer's as true, "it is not enough to show that the testator had Alzheimer's disease, even if the Alzheimer's

disease existed at the time the will was executed. The plaintiff must also show that Alzheimer's disease actually affected the testator's capacity to execute the will." *In re Estate of Goehring*, Columbiana App. Nos. 05 CO 27, 05 CO 35, 2007-Ohio-1133, ¶54, citing *Martin v. Dew*, Franklin App. No. 03AP-734, 2004-Ohio-2520, ¶20. See, also, e.g., *Meek v. Cowman*, Washington App. No. 07CA31, 2008-Ohio-1123, ¶17 (no evidence existed that decedent lacked testamentary capacity, even though he had been declared incompetent and was on medication for dementia, when there was no evidence as to how the dementia affected the decedent or that the dementia rendered him unable to understand what he was doing when he made his will); *In re Estate of Hall* (Tex.App. 2001), No. 05-98-01929-CV. Based on the record before us, we find no genuine issue of material fact that Clara satisfied the criteria for testamentary capacity at the time she wrote her 2006 will or when she had it witnessed.

**{¶ 35}** The trial court did not err in granting summary judgment to Richard and Martha on Elaine's claim that Clara lacked testamentary capacity.

IV

**{¶ 36}** Second, Elaine claims that the trial court erred in granting summary judgment to Richard and Martha on her undue influence claim.

**{¶ 37}** The elements of undue influence are: 1) a susceptible party; 2) another's opportunity to influence the susceptible party; 3) the actual or attempted imposition of improper influence; and 4) a result showing the effect of the improper influence. *Ingle v. Ingle*, Greene App. No. 2005 CA 110, 2006-Ohio-3749, ¶51, citing *West v. Henry* (1962), 173 Ohio St. 498, 501.

{¶ 38} "General influence, however strong or controlling, is not undue influence unless brought to bear directly upon the act of making the will. *If the will or codicil, as finally executed, expresses the will, wishes and desires of the testator, the will is not void because of undue influence*." (Emphasis in original) Id. Stated differently, "[t]he mere existence of undue influence or an opportunity to exercise it, although coupled with an interest or motive to do so, is not sufficient to invalidate a will; such influence must actually be exerted on the mind of the testator with respect to the execution of the will and, in order to invalidate the will, it must be shown that the undue influence resulted in the making of testamentary dispositions which the testator would not otherwise have made." *Buckingham v. Middlestetter* (Mar. 22, 1993), Montgomery App. No. 13575. Further, "[t]he fact that the will of a testator of admitted testamentary capacity disposes of his property in an unnatural manner, unjustly or unequally and however much at variance with the expressions by the testator concerning relatives or the natural objects of his bounty, does not invalidate the will unless undue influence was actually exercised on testator." *West*, 173 Ohio St. at 511.

{¶ 39} In granting summary judgment to Richard and Martha on Elaine's undue influence claim, the trial court recognized that Clara "was very possibly susceptible to influence due to her diminished mental condition" (element 1) and that Richard and Martha had opportunity to exert undue influence (element 2). The court found, however, that there was "no evidence that any undue influence was actually exerted or attempted at the time decedent prepared and signed her holographic will." The court indicated that there was no evidence that Richard and Martha were present when the 2006 will was prepared or that there was "any connection between any of the Defendants' influence and the decedent's act

of preparing her will." (Element 3.) The trial court also concluded that the alleged unfair distribution of Clara's property did not raise a presumption of undue influence and that it was "very clear from the evidence that the decedent was quite upset with the guardianship created at the behest of her daughter, the Plaintiff, and the disposition of the proceeds from the sale of her condominium. This clearly was a factor in her preparing her new will." (Element 4.)

{¶ 40} We agree that Elaine presented evidence that Clara was a susceptible party and that Richard and Martha had opportunities to influence her and, thus, that genuine issues of material fact exist regarding the first and second elements of undue influence. Although the extent of Clara's impairment from dementia in the summer of 2006 was disputed, the parties agree that Clara was diagnosed with dementia and Alzheimer's in July 2006 by Dr. Byers. In September 2006, the probate court investigator filed a report, stating that it "appears that she [Clara] can be easily influenced." John also wrote to Richard in July 2006 that "[w]e both know that either of us could spend a little time and convince Clara of whatever we wanted." On the other hand, the record also contains evidence to refute a conclusion that Clara was easily influenced around the time that she made her handwritten will, and Martha and Richard testified that they did not believe that Clara was easily influenced. Notably, John stated in his deposition that Clara was not open to suggestion from him during August 2006, after the guardianship petition was filed. However, Elaine's evidence, construed in her favor, creates a genuine issue of material fact regarding Clara's susceptibility.

{¶ 41} In addition, there was evidence that Richard and Martha had opportunities to

exert influence over Clara. Richard testified in his deposition that he came to Xenia on July 26, 2006, after John's guardianship petition was filed, and took Clara back to the Cleveland area. While en route back to their residence, Martha contacted a friend who worked as a paralegal for a probate attorney, Richard Hennig. The following day, Richard, Martha, and Clara went to Hennig's office and spoke to him about the guardianship proceeding that John had filed. Clara stayed with Richard and Martha until July 31, 2006. On August 16, 2006, Richard took Clara to see John Herbert of Merrill Lynch regarding Clara's request to have Herbert transfer approximately $71,000 to another account. The 2006 will was dated August 19, 2006.

{¶ 42} Martha and Richard testified that they saw Clara in Xenia again on August 20, 2006, after they received a phone call from Clara asking them to come to see her.[2] The Marshes took Clara to Pennsylvania from August 28 to August 31, 2006. The 2006 will was witnessed by Reverend Gaylor and Patricia Fuller on September 1, 2006; Clara was driven to the church by the Marshes. Construing the evidence in Elaine's favor, the trial court properly concluded that there was evidence that the Marshes had opportunities to influence Clara regarding the execution of a new will.

{¶ 43} Elaine claims that the trial court erred in concluding that there were no genuine issues of material fact as to whether the Marshes actually exerted or attempted to exert undue influence and whether the 2006 will constitutes "a result showing the effect of the improper influence."

---

[2] Elaine indicates that she has filed a Civ.R. 60(B) motion based on newly discovered evidence that Clara did not call Richard in North Carolina on August 20, 2006. This evidence was not before the trial court when it granted summary judgment, and we may not consider it. See *Wallace v. Mantych Metalworking*, 189 Ohio App.3d 25, 2010-Ohio-3765, ¶10-11.

{¶ 44} As to whether the 2006 will constitutes "a result showing the effect of the improper influence" (element 4), Elaine emphasizes that Clara disinherited her daughter, while giving half of her estate to Martha, who had been married to Richard for approximately 15 months when the 2006 will was executed. Upon review of the evidence, we find a genuine issue of material fact as to whether the 2006 will reflects the result of undue influence. The 1996 will distributed Clara's assets evenly to her children, whereas the 2006 will gives "everything" to Richard and Martha, her son and his wife. There is evidence in the record to explain the change in the distribution of Clara's estate, such as Clara's anger toward Elaine regarding the guardianship and her fondness for Martha (who had been part of Richard's life since 1996). Nevertheless, the terms of the 2006 will created an issue of fact as to whether it was "a result showing the effects of undue influence."

{¶ 45} The pivotal issue in this case is whether Elaine presented evidence of "the actual or attempted imposition of improper influence" by the Marshes (element 3). In moving for summary judgment, Richard and Martha asserted that Clara was concerned about how the proceedings from the condominium sale would be handled, and that she was upset about the guardianship proceedings initiated by John. There is ample evidence to support the assertions. The Marshes argued: "While news of the guardianship legal proceedings may have upset Clara and motivated her to execute the 2006 Will, this does not rise to the level of undue influence under Ohio law. Informing Clara as to the guardianship proceedings is not improper 'undue influence.' Plaintiff can present no evidence to show that Clara did not make her own decision as to whom she wanted to leave her estate in her Will. If Plaintiff's actions in her guardianship proceeding upset Clara, she was entitled to

act as she desired, even if it seems unfair to Plaintiff. ***"

{¶ 46} Elaine claims that the circumstantial evidence supports a conclusion that the Marshes actually imposed undue influence on Clara. Elaine argues that the Marshes first "tried to have Clara's equity in her condominium deposited in a joint in survivorship bank account" and, when that failed, they influenced Clara into changing her will. Elaine emphasizes that there is rarely direct evidence of undue influence, but that it must be a factual question to be determined from the circumstantial evidence; and that, especially when all the evidence is considered, there is a genuine issue as to whether there was undue influence by the Marshes.

{¶ 47} The evidence indicates that Richard attempted to have the proceeds from the condominium placed in a survivorship account in his and Clara's names. For example, in a letter dated August 26, 2006, Richard wrote to Elaine: "On July sixth I told you and John that proceeds from the sale of mom's condo were going into a joint survivorship investment account." Richard does not dispute that he would have placed the funds in a joint survivorship account, although he claims that Clara wanted the proceeds to be placed into such an account (and the January 2004 letter supports this).

{¶ 48} After the July 6 conversation with Richard, the Graysons apparently decided to seek a guardianship for Clara. John testified that he spoke with Clara about the guardianship the day before the petition was filed; at that time, John "explained it to her in soft, kind terms that she was very comfortable with, and she was not upset at all." Elaine also said that she and John "were always trying to tell mom that [the] guardianship was just taking care of her the way we always had, just paying her bills, taking care of her needs,

taking her to all the doctors' appointments, and that's all the guardianship was. And she was very comfortable with that." The Graysons stated that, after Clara spoke with Richard about the guardianship, Clara was very upset.

{¶ 49} The Marshes' deposition testimony substantiated that Clara was driven to Cleveland on July 26, the day the guardianship petition was filed. Richard and Martha indicated that they discussed the guardianship proceeding with Attorney Hennig on July 27, and that Hennig recommended that they remove Clara's assets from John's control, have him removed as her attorney in fact, and have Clara write a new will. Richard testified that Hennig spoke with Clara privately, found her to be competent to create a new will, and offered to draft one for her. Richard testified that they declined to have Hennig draft a new will for Clara because they were "not here for that" and it would be "inflammatory, make our situation worse."

{¶ 50} During the evening of July 27, 2006, after the meeting with Hennig, Richard drafted a letter to John from Clara (at Clara's behest, Richard states), which removed John as her agent and executor. The next day (July 28, 2006), Richard drafted a letter from Clara to John Herbert of Merrill Lynch, asking him to transfer $71,279.07 to a National City Bank account. Clara signed both letters. On August 16, 2006, after learning that the funds were not transferred, Richard and Clara went to Herbert's office to discuss the matter.

{¶ 51} John testified that, after Clara returned to Xenia on August 1, 2006, Clara was "upset" and "frightened" and, at times, did not want John in her apartment. At times, Clara asked John, "Why are you stealing my money?" and "Why are you making Richard mad?" Richard indicated that Clara was very upset that John and Elaine were attempting to have her

found incompetent.

{¶ 52} The 2006 will, handwritten by Clara, was dated August 19, 2006; Elaine testified that Clara was often confused about dates. Martha and Richard testified that they left on August 18, 2006 to go Chapel Hill, North Carolina for Martha's daughter's college graduation. The Marshes testified that they traveled to Xenia, at Clara's request, on August 20, 2006, at which time Clara showed them the handwritten will. Richard and Martha indicated that they told Clara to "hide this someplace" and to think it over. When the Marshes took Clara to Christ Episcopal Church on September 1, Clara told Reverend Gaylor and Fuller that she wanted them to sign the 2006 will as witnesses. Clara repeated this to Reverend Gaylor in private when Gaylor wanted assurance that Clara was certain she wanted to create a new will. Clara left the will at the church for safekeeping.

{¶ 53} Circumstantial evidence and direct evidence are of equal value, especially because some facts can only be proved by circumstantial evidence. *State v. Jenks* (1991), 61 Ohio St.3d 259, 272. The "weight accorded an inference is fact-dependent and can be disregarded as speculative only if reasonable minds can come to the conclusion that the inference is not supported by the evidence." *Wesley v. The McAlpin Co.* (May 25, 1994), Hamilton App. No. C-930286, citing *Donaldson v. Northern Trading Co.* (1992), 82 Ohio App.3d 476, 483. The question of whether the circumstantial evidence is conjectural and the inference speculative is essentially "the distinction between a reasonable inference and a guess." *Mid-America Tire, Inc. v. PTZ Trading Ltd.*, 95 Ohio St.3d 367, 2002-Ohio-2427, ¶156.

{¶ 54} Construing the evidence in the light most favorable to Elaine, we find a

genuine issue of material fact as to whether the Marshes imposed undue influence on Clara. Viewed in Elaine's favor, the evidence demonstrates that Richard wanted Clara's proceeds from the sale of the condominium to be placed in a survivorship account in his and Clara's names. The result of such an account would be that Richard would receive Clara's proceeds upon her death. An e-mail written by John to Richard indicated that John had spoken to Clara about how the proceeds should be handled, and Clara expressed to John that they should be placed in her Merrill Lynch account (which would have made them part of her estate upon her death). The Graysons further testified that they had discussed the guardianship with Clara, and she was "very comfortable" with it.

{¶ 55} When John sought guardianship of Clara, primarily due to the dispute over the proceeds, Richard and Martha took Clara to Cleveland, where they spoke to a probate attorney regarding the guardianship proceeding. Richard stated that they were advised to take control of Clara's assets, have John removed as Clara's agent, and have Clara write a new will. The same evening that the Marshes met with Hennig, Richard drafted a letter to John removing him as Clara's agent, and the next day, Richard wrote a letter to Herbert of Merrill Lynch asking that money be transferred to a different account. Clara signed both of those letters.

{¶ 56} When Clara returned from Cleveland on August 1, she was frightened and upset. She often did not want to visit with John and Elaine, even though the Graysons had previously looked  after Clara's personal and financial needs and had visited with her daily without incident.

{¶ 57} The 2006 will, handwritten by Clara, was dated August 19, 2006, three days

after Richard and Clara went to meet with Herbert of Merrill Lynch about his failure to transfer Clara's asserts. Although the Marshes presented testimony that they were in North Carolina on August 19, the Graysons testified that Clara did not keep track of dates well. They stated that Clara sometimes got ready for church on the wrong day, thinking that it was Sunday. When the Marshes saw the 2006 will, they advised Clara to "hide" it so that Elaine would not see it.

{¶ 58} The Marshes took Clara to Christ Episcopal Church on September 1 to have the 2006 will witnessed; Richard and Martha testified that Clara asked them to take her to the church. At the church, Clara told Reverend Gaylor and Fuller that she wanted them to sign the 2006 will as witnesses. Although Clara repeated this to Reverend Gaylor in private when Gaylor wanted assurance that Clara was certain she wanted to create a new will, the Marshes were present when Gaylor and Fuller signed the 2006 will. The will was left at the church. Clara and the Marshes did not inform their attorney that Clara had made a new will, even though they met with the attorney immediately after leaving the church.

{¶ 59} In short, the evidence, construed in Elaine's favor, supports a conclusion that Richard wanted the proceeds in a survivorship account and, after John filed a petition for guardianship, Richard consulted with a probate attorney and influenced Clara to take all the steps that Hennig suggested – including the writing of a new will – to make sure that Richard would receive the condominium proceeds upon Clara's death.

{¶ 60} We recognize that Richard and Martha presented substantial evidence that Clara was aware of what she was doing, that she was upset with John and Elaine about the guardianship proceeding, and that Richard merely assisted her in doing what she, in fact,

wanted to do. However, at this stage, we must construe all evidence in favor of the non-moving party (Elaine), and summary judgment is not appropriate if the non-moving party has presented evidence to the contrary. Whether or not there was "undue" influence and whether it was "actually exerted" upon Clara are genuine issues that remain and which must be proven at trial.

{¶ 61} Accordingly, the trial court erred in granting summary judgment to the Marshes on whether they had exerted undue influence.

V

{¶ 62} Elaine's assignment of error is overruled in part and sustained in part.

{¶ 63} The trial court's judgment will be affirmed in part and reversed in part, and the matter will be remanded for further proceedings.

· · · · · · · · · ·

FAIN, J. and DONOVAN, J., concur.

Copies mailed to:

Arthur R. Hollencamp
Matthew C. Sorg
Hon. John C. Newlin
(sitting by assignment)