[Cite as *Ayer v. Morenz-Harbinger*, 2020-Ohio-6861.]

# IN THE COURT OF APPEALS
## FIRST APPELLATE DISTRICT OF OHIO
## HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| LAWRENCE SCOTT AYER, | : | APPEAL NOS. C-190687 |
| | | C-190716 |
| and | : | TRIAL NO. 2018001714 |
| MARK D. AYER, | : | *O P I N I O N.* |
| Plaintiffs-Appellants, | : | |
| vs. | : | |
| DEBORAH LYNN AYER MORENZ-HARBINGER, | : | |
| | : | |
| Defendant-Appellee, | : | |
| and | : | |
| | : | |
| ST. DOMINIC CATHOLIC CHURCH, et al., | : | |
| Defendants. | : | |

Appeals From:  Hamilton County Court of Common Pleas, Probate  Division

Judgment Appealed From Is:  Affirmed as Modified

Date of Judgment Entry on Appeal:  December 23, 2020

*Stagnaro, Saba & Patterson Co., L.P.A.*, *Paul T. Saba*, *Jeffrey M. Nye* and *Christopher R. Jones*, for Plaintiff-Appellant Lawrence Scott Ayer,

*Lindhorst & Dreidame Co., L.P.A.*, and *Bradley M. McPeek*, for Plaintiff-Appellant Mark D. Ayer,

*Dinsmore & Shohl LLP*, *Brian S. Sullivan* and *Sarah B. Cameron*, for Defendant-Appellee Deborah Lynn Ayer Morenz-Harbinger.

**WINKLER, Judge.**

{¶1} Plaintiffs-appellants Lawrence Scott Ayer ("Larry") and Mark D. Ayer ("Mark") filed a complaint contesting the will of Ruth Rattermann ("Ruth"). The Hamilton County Court of Common Pleas, Probate Division, granted judgment in favor of defendant-appellee Deborah Lynn Ayer Morenz-Harbinger ("Debbie") and the other beneficiaries of the will, and dismissed Larry and Mark's claims. We find no merit in Larry and Mark's sole assignment of error, and we affirm the trial court's judgment.

*Facts and Procedure*

{¶2} Ruth was, by all accounts, strong-willed, independent, and intelligent. She was married to her husband Jack for over 54 years before he died in 2006. She lived in a condominium that she and her husband had purchased. Ruth and Jack did not have any children. Larry, Mark, and Debbie were the children of her sister, Grace, and Ruth was their aunt.

{¶3} Until her retirement, Ruth had a career as an executive secretary at a bank. Although Ruth and Jack had accumulated substantial wealth, they lived frugally and were not ostentatious. After her husband died, Ruth lived on her own. For the 12 years prior to her death, she drove a car, managed her own shopping, wrote checks to pay her bills, worked with an accountant to pay taxes, and otherwise took care of herself. She enjoyed going to church and to the local YMCA to work out and socialize. She stayed in touch with her sister-in-law and good friend, Evelyn Rattermann ("Evelyn").

{¶4} In 2014, Ruth became concerned about her sister Grace's strange behavior, particularly concerning was that Grace was named as Ruth's power of attorney. After discussing the matter with Evelyn, Ruth decided that she needed to

2

have a new power of attorney prepared. Evelyn suggested a local attorney, Lew Seiler, because she had previously used his services and he made house calls. Ruth contacted Seiler and set up an appointment to arrange for the preparation of a new power of attorney and a will.

{¶5} Seiler has been an attorney since 1979. He specializes in estate planning for senior citizens. He often received referrals from Hamilton County Adult Protective Services and Pro Seniors. Over the course of his career, Seiler has prepared hundreds of wills and powers of attorney. Seiler typically followed the same procedure when meeting a client for the first time. He tried to get to know the client, to determine whether the client was capable of making a will, and to find out how the client wanted to pass on his or her estate. He asked a series of questions to determine whether the client knew their family and relatives and the extent of their assets in general. He also made sure that the client was not being unduly influenced by meeting with the client alone, outside the presence of family or friends.

{¶6} Seiler met with Ruth on April 8, 2014, and took notes of his interview with her. She identified several relatives and friends that she wanted to bequeath to when she died and the specific item or dollar amount she wished to leave them. She further stated that she wanted to leave the rest of her assets to her niece Debbie, because Debbie had taken care of her. Seiler prepared and printed the will while he was at Ruth's condominium. He reviewed it with her line by line.

{¶7} Ruth then called her neighbor, Doris Barrett, to witness the will. Ruth signed it, witnessed by Barrett and Seiler. Seiler also prepared a power of attorney and a health-care power of attorney for Ruth, naming Debbie as her agent. After Seiler left, Ruth called Barrett to thank her for witnessing her will. She then noted in her journal that she had signed her will that day.

{¶8}   Several months later, Debbie's husband, who was an attorney, called Seiler about the power of attorney.  He told Seiler that "there was a change in the statute" and asked if Seiler would change the format.  Additionally, Debbie's name had been misspelled, and she thought it should be corrected.  Seiler verified with Ruth that "it was okay to redraft it and that she still wanted Debbie to be her power of attorney," and he then made the changes.  Seiler did not notarize the redrafted document or see Ruth execute it.  He indicated that the first power of attorney and the second "pretty much cover[ed] the same thing."  The only real difference was that the revised power of attorney had a section for the agent to sign stating that the agent understood and accepted the duties and responsibilities of a power of attorney.  Debbie and a notary were present when Ruth signed the revised power of attorney.

{¶9}   After signing the documents, Ruth put them in a drawer, where they remained until the last week of her life.  She continued living an active life.  She attended a wedding a month after signing her will.  She visited her family and friends, and she went to church, the YMCA, and various sporting events.  She managed her own finances and worked with an accountant to prepare her taxes.  Her accountant indicated that she answered numerous detailed questions about her assets and her tax situation, and that she understood her finances.  He stated, "Never once did I think she did not understand."

{¶10}  Larry and Mark saw Ruth at family gatherings.  They did not visit or call to see how she was doing.  When they did see Ruth, they observed that she was "pretty sharp."  They acknowledged having little knowledge of the circumstances surrounding the execution of Ruth's will or of her intentions or capacity at that time.

{¶11}  Ruth had a stroke in June 2017, and, though her health started to deteriorate, she remained sharp and strong-willed.  Debbie had taken care of her in

4

the past, but by that time, Debbie had moved to the state of Washington. Thereafter, Debbie employed a service called Right at Home to provide daily home care to Ruth. According to Right at Home caregivers, Debbie would call often to check on Ruth.

{¶12} In December 2017, Debbie called Larry and told him that Ruth was in bad shape. She asked that he and Mark find some time to visit Ruth. On December 19, Mark and Larry finally visited her, which was Larry's only visit, and he left town after his visit. Mark returned on December 21. At that time, he had the opportunity to read Ruth's will and power of attorney, after which he became infuriated.

{¶13} Lisa Luehrmann was Ruth's niece by marriage and a beneficiary under the terms of the will. She was a nurse who had also been helping care for Ruth. Luehrmann said that Ruth often spoke fondly of Debbie, but rarely mentioned Larry or Mark. After their visit, Larry and Mark both called Luehrmann and asked her to be the executor of Ruth's estate. Luehrmann felt uncomfortable with that request, as she had just met Larry and Mark and she was not a "blood relative." She indicated that Ruth was "was a little annoyed or troubled" by Mark and Larry's visit.

{¶14} One of Ruth's caregivers wrote in a contemporaneous note that Mark and Larry made Ruth "upset" and "extremely confused." When they left, her anxiety "became so bad" and there was "lots of crying and also thinking she was going to die sooner." The caregiver had to sit in Ruth's room for an hour after they left "so she could calm down."

{¶15} Mark also called Seiler, after seeing his name on the will. He accused Seiler of being in cahoots with Debbie's husband, whom Seiler had never met. Mark made several hostile comments and hung up the phone on Seiler.

{¶16} Subsequently, Mark called Hamilton County Adult Protective Services ("APS"). In that call, he described his aunt as "of sound mind and very sharp." He

stated that Debbie was not caring for Ruth and that she was just waiting for her to die since she would inherit the bulk of Ruth's estate. According to Mark, Debbie only wanted the services of hospice, not health care providers.

{¶17} That same day, APS went to visit Ruth. Debbie, who had taken an overnight flight, was annoyed that Mark had called APS, but she gave the APS caseworker unfettered access to Ruth. Debbie told the caseworker that she had been caring for Ruth and that there had been a feud between her and her brothers since their mother's death. She said that she had tried numerous times to get Ruth to "go to hospice," but Ruth had refused.

{¶18} The notes from APS showed that the caseworker had no concerns about Ruth's care. Ruth was confused about her power of attorney, the contents of her will, and what would happen after her death. But the notes also showed that Ruth said that "Mark and Larry have done nothing for her, and that Debbie has done a significant amount for her." She also stated that "Debbie is a good person to care for her and that she is more familiar with medication/health problems." The notes also showed that Ruth did not want services from hospice, and she did not want to cause any more family conflicts.

{¶19} The following day, APS spoke with personnel from Right at Home. They reported that Ruth's health was declining, that no one had met Mark or Larry, that Lisa and Debbie were the only people who had been at Ruth's home, and that there had "never been any shady dealing." They also reported that Ruth had eventually agreed to receive hospice services. APS also spoke with Vitas Hospice, which reported that it had assessed Ruth on December 21, and its doctor had agreed that hospice was appropriate. APS noted that both Vitas and Right at Home were mandatory reporters for alleged abuse, and neither had made any report.

{¶20} Ruth died on December 28, 2017, at the age of 92. After her death, Mark was so upset with APS records that he wrote a letter to the Hamilton County Department of Job and Family Services ("HCJFS") complaining about APS's investigation. In its reply letter, HCJFS stated that "the hospice agency * * * confirmed that Mrs. Rattermann was receiving around the clock care, after agreeing to hospice the day prior. They confirmed that her mental state and physical health were declining and had been for at least a month."

{¶21} The letter further stated that APS did not have sufficient evidence to support allegations of abuse or neglect. It added, "Further, there was nothing that led the APS worker to believe that there was any criminal wrongdoing, which would have prompted a referral to a law enforcement agency for a criminal investigation."

{¶22} On April 26, 2018, Larry filed a will-contest action against Debbie and the other beneficiaries of the will. He raised claims of lack of testamentary capacity and undue influence. He amended the complaint twice to add other claims, including improper execution of the will, embezzlement, and unjust enrichment. Mark was added as a plaintiff on the second amended complaint.

{¶23} The trial court granted summary judgment in favor of Debbie on Larry's claims for lack of testamentary capacity, undue influence, and improper execution of the will. The court further found that Mark and Larry lacked standing to raise their other claims and dismissed those claims. This appeal followed.

### *Debbie's Statute-of-Limitations Argument*

{¶24} First, we note that Debbie argues that Mark is not a proper party because he was not made a party until the filing of the second amended complaint, which was filed well outside of the statute of limitations. She mentions this

7

argument in a couple of sentences but does not provide any legal authority or citations to the record to support it.

{¶25} Under App.R. 16(B), an appellee's brief must conform to the same requirements as an appellant's brief. *Stanley Miller Constr. Co. v. Ohio School Facilities Comm.*, 192 Ohio App.3d 676, 2011-Ohio-909, 950 N.E.2d 218, ¶ 8 (10th Dist.). Thus, the appellee's brief must contain detailed arguments that point to relevant and specific portions of the transcript and arguments supported by citations to relevant authority. *See* App.R. 16(A)(7); *State v. Wright*, 4th Dist. Scioto No. 04CA2958, 2005-Ohio-5539, ¶ 5. While appellees have no burden to demonstrate error, they are required to cite to transcripts or legal authorities to assist the court in resolving the issues. *Przybyla v. Przybyla*, 2d Dist. Montgomery No. 27852, 2018-Ohio-3071, ¶ 108.

{¶26} Without further information, we decline to decide this issue. It is not this court's duty to "root out" arguments supporting a party's position on appeal. *See Cameron v. Univ. of Toledo*, 2018-Ohio-979, 98 N.E.3d 305, ¶ 61 (10th Dist.); *Stanley Miller Constr. Co.* at ¶ 8. We hold that Debbie forfeited the issue by failing to argue it as provided for in App.R. 16(B).

### Mark and Larry's Assignment of Error

{¶27} In their sole assignment of error, Mark and Larry contend that the trial court erred by granting Debbie's motion for summary judgment and in dismissing their claims. We find no merit in their assignment of error, and we affirm the trial court's judgment.

### Standard of Review

{¶28} An appellate court reviews a trial court's ruling on a motion for summary judgment de novo. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671

8

N.E.2d 241 (1996); *Chateau Estate Homes, LLC v. Fifth Third Bank*, 2017-Ohio-6985, 95 N.E.3d 693, ¶ 10 (1st Dist.). Summary judgment is appropriate if (1) no genuine issue of material fact exists for trial, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party, who is entitled to have the evidence construed most strongly in his or her favor. *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327, 364 N.E.2d 267 (1977); *Chateau Estate Homes* at ¶ 10.

{¶29} The moving party bears the initial burden of informing the court of the basis for its motion and demonstrating the absence of any genuine issues of material fact. *Dresher v. Burt*, 75 Ohio St.3d 280, 282-293, 662 N.E.2d 264 (1996); *Maas v. Maas*, 1st Dist. Hamilton No. C-190536, 2020-Ohio-5160, ¶ 14. Once the moving party has met its burden, the nonmoving party has a reciprocal burden to set forth specific evidentiary facts showing the existence of a genuine issue for trial. *Dresher* at 293; *Maas* at ¶ 14. The nonmoving party cannot rest on conclusory allegations or self-serving interpretations of the evidence presented. *Dresher* at 293; *Maas* at ¶ 14.

{¶30} The mere existence of factual disputes between the parties does not necessarily preclude summary judgment. Only disputes over genuine factual matters that affect the outcome of the suit will properly preclude summary judgment. Factual disputes that are irrelevant should not stop the entry of judgment as a matter of law. *Maas* at ¶ 15; *Smith v. A.B. Bonded Locksmith, Inc.*, 143 Ohio App.3d 321, 326, 757 N.E.2d 1242 (1st Dist.2001).

### *Will Contests Generally*

{¶31} The admission of a will to probate is prima facie evidence of the attestation, execution, and validity of the will. *Krischbaum v. Dillon*, 58 Ohio St.3d

58, 567 N.E.2d 1291 (1991), paragraph two of the syllabus; *Estate of Snell v. Kilburn*, 165 Ohio App.3d 352, 2005-Ohio-7076, 846 N.E.2d 572 ¶ 10 (7th Dist.). But that presumption is not irrebuttable. *Krischbaum* at 64; *Estate of Snell* at ¶ 10. To rebut the presumption, the person contesting the will must produce evidence that furnishes a reasonable basis for sustaining the claim. *Estate of Snell* at ¶ 10; *Springer v. Lee*, 3d Dist. Handcock No. 5-95-42, 1996 WL 223699, *2 (May 2, 1996). "If the evidence so produced furnishes only a basis for a choice among different possibilities as to any issue in the case, he fails to sustain his burden." *Springer* at *2, quoting *Kata v. Second Natl. Bank*, 26 Ohio St.2d 210, 271 N.E.2d 292 (1971), paragraph two of the syllabus.

### *Attestation*

{¶32} First, Larry and Mark argue that the probate court erred in concluding that the will was validly attested to as required by R.C. 2107.03. R.C. 2107.03 provides,

> Except oral wills, every will shall be in writing, but may be handwritten or typewritten. The will shall be signed at the end by the testator or by some other person in the testator's conscious presence and at the testator's express direction. The will shall be attested and subscribed in the conscious presence of the testator, by two or more competent witnesses, who saw the testator subscribe, or heard the testator acknowledge the testator's signature.

{¶33} Some of the cases Debbie cites in response involve the admission of a will to probate, which only requires the proponent to present a prima facie case. *See In re McGraw's Will*, 14 Ohio App.2d 87, 236 N.E.2d 684 (4th Dist.1967); *Blagg v.*

10

*Blagg*, 55 Ohio App. 518, 9 N.E.2d 991 (2d Dist.1936). Nevertheless, the same principals have been applied in will-contest cases.

{¶34} "It is not absolutely necessary that a testator sign a will in the presence of the witnesses. The validity of [the] signature may be presumed 'from the facts and circumstances of the case.' This presumption must be overcome by something more than 'slight, remote, or unsubstantial testimony.' " *Parks v. Kerns*, 7th Dist. Jefferson No. 82-J-32, 1984 WL 6519, *1 (Jan. 11, 1984), quoting *Haynes v. Haynes*, 33 Ohio St. 598 (1878), and *Blagg*. *Accord Groves v. Potocar*, 11th Dist. Lake No. 99-L-098, 2000 WL 1774169, *2 (Dec. 1, 2000). Further, acknowledgement of the decedent's signature or mark may be implied as well as express, taking into the consideration the facts and circumstances of the case. *Groves* at *3, citing *Blagg* at 522.

{¶35} In this case, the attestation stated,

The foregoing instrument was on this 8 day of April, 2014 signed at the end thereof by the said Ruth Marcella Rattermann, and by her acknowledged, published and declared to be her Last Will and Testament in the presence of us, who thereupon, at her request, and in her presence, and in the presence of each other, have hereunto subscribed or hands as attesting witnesses thereto.

It was signed by Ruth, Seiler, and Barrett.

{¶36} Seiler testified that he drafted the will, printed it, and reviewed it with Ruth. Ruth called her neighbor, Barrett, to be a witness. Seiler said that Ruth signed the will in Barrett's presence and in his presence. He said "[t]he three of us were in the same room of the condominium. We all signed it together."

11

{¶37} Barrett was 76 years old at the time the will was signed. She had been Ruth's neighbor for several years, and she saw or visited Ruth about once per week. On multiple occasions, Ruth had told Barrett that she wanted to give her assets to Debbie because Debbie was the one who cared for her.

{¶38} Barrett acknowledged that the signature on the will was her handwriting. She said that Ruth "called down here and asked me if I would come up—she was making a will out to Debbie, would I come up to her apartment and sign it—sign my name, that Debbie will get everything when she passes away." Barrett "went up and talked to her for a just a few minutes and I signed that paper, and I came back down. The lawyer was up there with her." Barrett signed the will as a witness because "the lawyer asked me to sign right here for Ruth to make that will out to Debbie." After Seiler left, Ruth called Barrett to thank her for signing the will as a witness.

{¶39} Larry and Mark rely solely on the following testimony from Barrett. Later in her deposition, she stated that she did not see the attorney sign the will. She further testified:

Q. Did you see Ruth actually sign the document?

A. No, I didn't.

Q. You didn't see Ruth sign it either?

A. No, I didn't. I wasn't up there.

Q. So, it was already signed when you actually signed the will?

A. I don't know about that now, but I did sign it.

Q. I understand that.

A. I don't know if Ruth already signed it or not, because I didn't stay up there. I came back down here.

12

Q. So, while you were upstairs, you did not witness or see Ruth execute or sign that will; it that correct?

A. I didn't see Ruth sign, nothing, no.

{¶40} The attestation clause was valid on its face, and therefore, it was entitled to a presumption of proper execution. *See Estate of Snell*, 165 Ohio App.3d 352, 2005-Ohio-7076, 846 N.E.2d 572, at ¶ 31; *In re Will of McGraw*, 14 Ohio App.2d at 89-90, 236 N.E.2d 684. The testimony cited by Mark and Larry is insufficient to overcome the presumption of validity or to create a question of material fact in that regard.

{¶41} First, the fact that the will was drawn by the attorney who was present at its execution was "strong presumptive evidence that the execution of the will was regular." *Estate of Snell* at ¶ 30; *In re Will of McGraw* at 89. Seiler testified that he ensured that all formalities were followed. He prepared the will, witnessed Ruth sign it as the testator, and saw Barrett sign it as a witness. Both Seiler and Barrett confirmed their signatures.

{¶42} Further, simply because a witness cannot recall whether the testator's signature was on a document, the testator should not be deprived of the right of disposing of the testator's property by will. *Groves*, 11th Dist. Lake No. 99-L-098, 2000 WL 1774169, at *3. *Blagg*, 55 Ohio App.2d at 522, 9 N.E.2d 991.

> In the absence of explicit and definite testimony [,] a witness should not be permitted to contradict that to which he has subscribed. The testator is not here to dispute witnesses' testimony. * * * "The privilege of disposing of one's estate by will is a valuable right, and it has been written that he should not be deprived of this right upon slight, remote, or unsubstantial testimony."

*Blagg* at 522, quoting *Robertson v. Robertson*, 232 Ky. 572, 576, 24 S.W.2d 282 (1930). As the trial court stated, "under the circumstances of this case * * * Plaintiff cannot in this case create a triable issue based solely on Ms. Barrett's lack of memory as to the details of the execution." We agree.

{**¶43**} We decline to invalidate Ruth's will based on "slight, remote or insubstantial testimony," as has been offered here. *See Parks*, 7th Dist. Jefferson No. 82-J-32, 1984 WL 6519, at *1. Such testimony is insufficient to create a genuine issue of material fact concerning the will's attestation. Consequently, we reject Mark and Larry's arguments as to the attestation.

### *Undue Influence*

{**¶44**} Next, Larry and Mark argue that Debbie exercised undue influence on Ruth in executing the will. The elements of undue influence are: (1) a susceptible testator; (2) another's opportunity to exert undue influence; (3) improper influence exerted or attempted; and (4) a result showing the effect of that influence. *West v. Henry*, 173 Ohio St. 498, 510-511; 184 N.E.2d 200 (1962); *Knowlton v. Schultz*, 179 Ohio App.3d 497, 2008-Ohio-5984, 902 N.E.2d 548, ¶ 8 (1st Dist.).

{**¶45**} The admission of a will to probate is prima facie evidence of its validity. The parties contesting the will bear the burden of proving the elements of undue influence. *West* at 511; *Knowlton* at ¶ 8.

> The mere existence of undue influence or an opportunity to exercise it, although coupled with an interest or motive to do so, is not sufficient to invalidate a will, but such influence must be actually exerted on the mind of the testator with respect to the execution of the will in question; and, in order to invalidate the will, it must be shown that the

14

undue influence resulted in the making of testamentary dispositions which the testator would not otherwise have made.

*West* at 511.

{¶46} "General influence, however strong or controlling, is not undue influence unless brought to bear directly upon the act of making the will." *Knowlton* at ¶ 10, quoting *West* at 511. "Simply because the testator's will disposes of his property 'in an unnatural manner, unjustly or unequally and * * * at variance' with the testator's expressions about relatives or the natural objects of his bounty, does not invalidate the will unless undue influence was actually exercised on the testator." *Knowlton* at ¶ 10, quoting *West* at 511. The testator's declarations not made contemporaneously with or near to the will's execution are not admissible as proof of undue influence. *West* at 511; *Knowlton* at ¶ 10.

{¶47} The first element is that the testator was susceptible. The bulk of the evidence clearly showed that Ruth was not susceptible. Her family and friends all stated that at the time she executed the will, she was of sound mind, she handled her own affairs, lived an active life, knew the extent of her assets, and made her own decisions. Nevertheless, Mark and Larry presented expert testimony that Ruth suffered from depression, which made her susceptible to Debbie's influence. Thus, there was an issue of fact on this element.

{¶48} Debbie had opportunities to exert influence, given how much time she spent with her aunt. But the influence must be "undue." In determining whether influence is "undue," the focus is on whether the influence was reasonable given the prevailing facts and circumstances. *Krischbaum*, 58 Ohio St.3d at 68, 567 N.E.2d 1291. Nothing in the record shows that any influence Debbie had was unreasonable. *See Groves*, 11th Dist. Lake No. 99-L-098, 2000 WL 1774169, at *4.

15

**{¶49}** Finally, there is no evidence at all that Debbie exerted or attempted to exert influence over the will or that the will shows any influence by her. Larry and Mark rely on outlandish claims about Debbie's conduct that have little or no evidentiary support. They claim that following the execution of the will and power of attorney, Debbie used the power of attorney granted to her by Ruth to isolate Ruth and systematically steal her money. They also rely on evidence of examples of Ruth's alleged cognitive impairment just prior to her death, but all those alleged events occurred years after the execution of the will.

**{¶50}** This court has stated, "[T]he relevant time period is the time at or near the execution of the will. Courts have held that evidence regarding the exertion of undue influence relating to the execution of a legal document must be confined to a reasonable period before and after the execution of the document." *Knowlton*, 179 Ohio App.3d 497, 2008-Ohio-5984, 902 N.E.2d 548, at ¶ 22. The determination of what constitutes a reasonable time period lies within the trial court's discretion. *Id.* The probate court found that "[t]hose events were too far removed in time to have relevance to the will contest causes of action * * *." This determination was not so unreasonable, arbitrary, or unconscionable as to connote an abuse of discretion. *See Blakemore v. Blakemore*, 5 Ohio St.3d 217, 218, 450 N.E.2d 1140 (1983); *Cincinnati v. Harrison*, 1st Dist. Hamilton No. C-090702, 2010-Ohio-3430, ¶ 7.

**{¶51}** Ruth told her friend Evelyn that she was concerned because her sister, Grace, who had her power of attorney, was acting strangely. Evelyn suggested that she contact Seiler and that she see about a will, too. Ruth called Seiler herself. Seiler came and spoke to Ruth alone. His deposition indicated that she had the capacity to execute the will and that she knew what she wished to do. His notes show that he wrote a zero next to Larry's and Mark's names. As the trial court stated, "this was

16

not an inadvertent omission." Ruth said repeatedly she wanted to leave her assets to Debbie because Debbie took care of her. Mark and Larry barely knew Ruth and had little contact with her. *See Doyle v. Schott*, 65 Ohio App.3d 92, 95-96, 582 N.E.2d 1057 (1st Dist.1989).

{¶52} The only individuals present during the signing of the will were Ruth, Seiler, and Barrett. Debbie was not in the room or anywhere nearby. Larry and Mark contend that simply because Debbie was not present did not mean that she was not exerting influence. But there is simply no evidence that Debbie was involved in any way in the drafting and execution of the will. *See Groves*, 11th Dist. Lake No. 99-L-098, 2000 WL 1774169, at *5.

{¶53} Mark and Larry assert issues of fact exist because their expert opined that there was influence that was exerted. But that testimony did not establish that the will was the result of that influence. *See Boley v. Kennedy*, 3d Dist. Crawford No. 3-02-35, 2003-Ohio-1663, ¶ 22. Mark and Larry have not met their burden to show that issues of fact exist for trial on the issue of undue influence.

### *Testamentary Capacity*

{¶54} Finally, Mark and Larry argue that Ruth lacked testamentary capacity. Testamentary capacity exists when the testator has sufficient mind and memory: (1) to understand the nature of the business in which he or she is engaged; (2) to comprehend generally the nature and extent of his or her property; (3) to hold in his or her mind the names and identity of those who have natural claims upon his or her bounty; and (4) to be able to appreciate his or her relation to the members of his or her family. *Niemes v. Niemes*, 97 Ohio St. 145, 119 N.E. 503 (1917), paragraph four of the syllabus; *Doyle*, 65 Ohio App.3d at 94, 582 N.E.2d 1057.

17

{¶55} Testamentary capacity is determined as of the time of the will's execution. Evidence of the testator's mental and physical condition at the time of the making of the will, as well as a reasonable time before and after, is relevant and admissible. *In re Estate of Flowers*, 2017-Ohio-1310, 88 N.E.3d 599, ¶ 73 (6th Dist.); *In re Estate of Marsh*, 2d Dist. Greene No. 2010 CA 78, 2011-Ohio-5554, ¶ 18.

{¶56} Courts have held that a testator had testamentary capacity despite the testator engaging in long-term alcohol abuse and having a personality disorder or having dementia or Alzheimer's disease. *Estate of Flowers* at ¶ 76; *Estate of Marsh* at ¶ 20-25; *Doyle* at 95. Even being declared incompetent does not necessarily mean that the testator lacks testamentary capacity. *See Taylor v. Garinger*, 30 Ohio App.3d 184, 185-187, 507 N.E.2d 406 (12th Dist.1986). The person contesting the will must show that these conditions affected the testator's capacity to make a will. *Estate of March* at ¶ 34. "While a temporary failure of memory might exist, nevertheless the solid power of understanding may remain." *Meier v. Peirano*, 76 Ohio App. 9, 16, 62 N.E.2d 920 (1st Dist.1945).

{¶57} The record overwhelming demonstrates that Ruth had testamentary capacity. Seiler stated that without a doubt, she had testamentary capacity, as did all her relatives and friends. Larry and Mark argue that she did not comprehend the nature and extent of her estate. They contend that Ruth could only identify $300,000 of her estate based on Seiler's notes. But the record shows that Ruth was able to list her many financial accounts, her personal assets, and her real estate. Seiler wrote the figure $300,000 in his notes, but he could not remember its meaning. He stated, "That is a number she would have given me. I can't tell you whether that was an estimate of everything or just the stock account. I don't remember, I'm sorry." Further, the record shows that Ruth had an account with

approximately that amount at the time. Thus, Seiler's notation does not show a lack of testamentary capacity.

{¶58} The cases only require that the testator know the general nature and extent of his or her property. The record unequivocally shows that Ruth knew the nature and extent of her property at the time she executed her will. Larry and Mark have presented no evidence to the contrary, and there is no merit to their claim that she lacked testamentary capacity.

### The Remaining Claims

{¶59} Finally, the trial court concluded that because it had found that the will was valid, Larry and Mark had no standing raise the other claims in the second amended complaint. The court granted summary judgment in favor of Debbie and against Larry on claims one, three and ten. Those claims were for incapacity, undue influence, and improper execution of the will.

{¶60} Counts two and four were duplicate claims of incapacity and undue influence brought by both Mark and Larry. Though the court stated Mark and Larry lacked standing on those counts, the trial court properly should have granted summary judgment in favor of Debbie on those counts as well. We hereby modify the trial court's judgment to reflect that determination.

{¶61} The fifth claim was for concealment or embezzlement of assets under R.C. 2109.50. Given that we have found the will to be valid, and Mark and Larry are not beneficiaries under the will, neither of them is an interested party as defined in the statute, and therefore, they lack standing to pursue that claim. *See Wozniak v. Wozniak*, 90 Ohio App.3d 400, 405-406, 629 N.E.2d 500 (9th Dist.1993).

{¶62} The sixth, seventh, eighth and ninth claims allege claims for unjust enrichment, breach of the power of attorney, a constructive trust, and injunctive

19

relief, respectively. Because Larry and Mark do not have an interest in the estate, they lack standing to bring those claims. *See In re Estate of Yeager*, 11th Dist. Trumbull Nos. 2014-T-0107 and 2014-T-0108, 2015-Ohio-2458, ¶ 18; *In re Estate of Sacco*, 7th Dist. Columbiana No. 03 CO 39, 2004-Ohio-3196, ¶ 16-20.

### *Summary*

{¶63} In sum, we find no merit in Larry and Mark's arguments related to the attestation of the will and claims of undue influence and lack of testamentary capacity. We overrule their sole assignment of error, and we affirm the trial court's judgment, with the modification that summary judgment should be granted in favor of Debbie on counts two and four of the complaint, rather than being dismissed for lack of standing.

Judgment affirmed as modified.

**MYERS, P.J.**, and **BERGERON, J.**, concur.

Please note:

The court has recorded its own entry this date.