[Cite as *Rogers v. Rogers*, 2024-Ohio-5951.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| BRANDY A. ROGERS | : | |
| | : | |
| Appellant | : | C.A. No. 30172 |
| | : | |
| v. | : | Trial Court Case No. 2023 MSC 00337 |
| | : | |
| CURTIS M. ROGERS, ET AL. | : | (Appeal from Common Pleas Court-Probate Division) |
| | : | |
| Appellees | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on December 20, 2024

. . . . . . . . . . .

ADAM R. WEBBER & MAXWELL B. NEWSOME, Attorneys for Appellant

CURTIS M. ROGERS, Pro Se Appellee

. . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Appellant, Brandy A. Rogers, appeals from a judgment which: (1) found the document admitted to probate as Stanley Roger's Last Will and Testament was valid and would remain in effect for administration; and (2) dismissed Brandy's complaint challenging the will. In support of her appeal, Brandy contends the trial court erred in

admitting a copy of an alleged "lost" will that had not been executed with the necessary formalities and whose contents could not be proven. Brandy further asserts that the court erred in finding that Stanley had not revoked his will where there was evidence of revocation and no evidence to the contrary. Finally, Brandy argues the court erred in considering public policy goals surrounding the creation and administration of wills in order to override statutory requirements.

**{¶ 2}** After reviewing the record and applicable law, we agree that the trial court erred in finding that the "lost" will remained in effect and in dismissing the will contest action. While the order admitting the alleged lost will was prima facie evidence of its validity, Brandy rebutted the presumption by proving by a preponderance of the evidence that the will failed to comply with statutory requirements and that the contents could not be proven. Given this conclusion, the other assignments of error are moot and/or need not be considered. Accordingly, the judgment of the trial court will be reversed, and this cause will be remanded to the trial court for further proceedings consistent with this opinion.

## I. Facts and Course of Proceedings

### A. 2021 Estate Filing

**{¶ 3}** Because the trial court addressed three consolidated probate cases, we will discuss them all. In April 2021, attorney Gary Gottschlich filed an application to administer the estate of Stanley Rogers, who had died in January 2021.[1] The application

---

[1] Because the involved litigants have the same last name, we will refer to them by their first names.

stated that, to the attorney's knowledge, Stanley had not left a will. Both of Stanley's daughters, who were the next-of-kin and statutory beneficiaries, waived their right to administer the estate. The court accepted the application, and the case was docketed as Montgomery P.C. No. 2021 EST 793. Shortly thereafter, attorney Cassandra Rice was substituted as counsel for the administrator, and administration of the case proceeded. However, in early August 2022, Rice filed an application for admission to probate of a lost, spoliated, or destroyed will that Stanley allegedly had executed on September 11, 2014. According to the application, Stanley's brother, Curtis M. Rogers, had sent the will to Rice in late June 2022, stating that Stanley had sent the will electronically to him on September 11, 2014.

{¶ 4} Rice filed the alleged will, which was two pages. The first page was the will itself, which was signed by Stanley, and a second page labeled as a "self-proving affidavit" was signed by Stanley and two witnesses. The second page was also notarized.

B. 2022 Application for Probate of a Lost Will

{¶ 5} On August 22, 2022, Curtis filed a pro se application to probate a lost will, and the court designated this case as Montgomery P.C. No. 2022 EST 1753. The court then held an evidentiary hearing for purposes of both cases in April 2023, at which time it heard testimony from the following individuals: the two persons who had witnessed the will; Curtis; the decedent's daughters (Jasmin and Brandy); Harlan aka Frank Rogers (another brother of Stanley); and Rice. In May 2023, the court issued a decision finding that the will should be admitted to probate. *See* Decision, Order and Entry Regarding

Application for Admission to Probate Lost, Spoliated or Destroyed Will (May 15, 2023) ("Admission Dec."). This decision was also filed as part of the record in the will contest case.

{¶ 6} After Brandy appealed from the admission decision, which was filed in both of the above cases, we issued a show cause order. We then dismissed the appeals for lack of a final appealable order. *See* Montgomery C.A. Nos. 29831 and 29832 (Decision & Final Judgment Entry, June 29, 2023), p. 1-3. We noted that orders admitting wills are not reviewable on appeal and that the only method of challenging admission of an will would be filing a will contest action, which could be reviewed. *Id.*

## C. The 2023 Will Contest Action

{¶ 7} Consistent with our decisions dismissing the appeals, Brandy then filed a complaint for will contest, declaratory judgment, and injunctive relief in the probate court. That case was docketed as Montgomery P.C. 2023 MSC 337 (the current case). The defendants were Stanley's brothers (Curtis, Harlan, and W.R.), Jasmin, and Gottschlich.

{¶ 8} In the complaint, Brandy first alleged the admitted will failed to meet the requirements of R.C. 2107.03 because: (1) Stanley did not sign it at the "end"; (2) the will was not signed by two or more competent witnesses; and (3) the will was incomplete because it was two pages long and only one page was presented. In a second claim, Brandy asserted that Stanley had revoked the will by destroying it. Attached to the complaint were the admitted will and the Admission Decision in Case No. 2021 EST 793. Both Gottschlich and Curtis, acting pro se, filed answers to the complaint. At that point,

Brandy filed a motion for default judgment against Harlan, W.R., and Jasmin, who had been served but failed to timely file answers. Subsequently, the court set a bench trial for February 27, 2024, and a December 1, 2023 deadline for filing dispositive motions.

{¶ 9} In December 2023, Brandy filed a motion for summary judgment, but no parties responded. Due to the impending trial date, the court issued a decision on January 19, 2024, denying Brandy's motions for summary judgment and default judgment. The court also consolidated all three cases (Case Nos. 2021 EST 793, 2022 EST 1753, and 2023 MSC 337). In early February 2024, Rice filed a complete transcript of the hearing held in the underlying estate cases. The trial court then filed an entry allowing the parties to submit additional evidence during the bench trial. Subsequently, the court held the trial as scheduled on February 27, during which the court heard additional testimony from Curtis and Brandy. The court also allowed the parties to file post-trial briefs.

{¶ 10} However, rather than filing a brief, Curtis filed a summary judgment motion the day after trial, alleging the court's admission of the will in the estate case was res judicata for purposes of the will contest. The court overruled the motion shortly thereafter. After the transcript of the February 27 bench trial was filed, Brandy and the Administrator filed post-trial briefs, and Curtis filed a motion to dismiss. The trial court then filed a decision rejecting the arguments of Brandy and the Administrator and concluding that the September 11, 2014 will was valid and would remain in effect. The court also dismissed Brandy's complaint contesting the will. *See* Final and Appealable Decision, Order and Entry after Bench Trial (May 15, 2024) ("Contest Dec."). Brandy

timely appealed from the court's judgment.

{¶ 11} With this background in mind, we will consider Brandy's assignments of error.

## II.   Whether the Will Was Properly Executed

{¶ 12} Brandy's first assignment of error states that:

The Trial Court Erred by Admitting a Copy of a Will Not Executed

With the Necessary Formalities and Whose Contents Cannot Be Proven.

{¶ 13} Under this assignment of error, Brandy contends the trial court improperly admitted the will because Stanley's will was not executed with necessary formalities and its contents could not be proven.   In this regard, Brandy asserts that the will was not signed at the end as statutorily required.   Instead, the will consisted of two pages, one of which was missing, and Stanley had signed only the first page.   Before we consider these issues, we will outline the pertinent law to be applied, bearing in mind that two situations are involved here: the will's admission based on Curtis's application to admit a "lost will," which the court held would remain in effect, and dismissal of the will contest action, which was consolidated with the other estate cases.

## A.   Applicable Law

{¶ 14} "Generally speaking, admitting a written will to probate requires a court to determine, from the face of the document itself, that it was executed in compliance with

the law." *In re Estate of Shaffer*, 2020-Ohio-6973, ¶ 11, citing R.C. 2107.18. This statute provides, in pertinent part, that "[t]he probate court shall admit a will to probate if it appears from the face of the will, or if the probate court requires, in its discretion, the testimony of the witnesses to a will and it appears from that testimony, that the execution of the will complies with the law in force at the time of the execution of the will in the jurisdiction in which the testator was physically present when it was executed, [or] with the law in force in this state at the time of the death of the testator. . . ."

**{¶ 15}** R.C. 2107.03 outlines requirements for making wills and states that:

Except oral wills, every will shall be in writing, but may be handwritten or typewritten. The will shall be signed at the end by the testator or by some other person in the testator's conscious presence and at the testator's express direction. The will shall be attested and subscribed in the conscious presence of the testator, by two or more competent witnesses, who saw the testator subscribe, or heard the testator acknowledge the testator's signature.

**{¶ 16}** "Attestation and subscription connote two acts: (1) an 'act of the senses' by personally observing the signing or acknowledgement of signature by the testator and (2) a physical act of signing the document, under the observation of the testator, to prove that the attestation occurred." *Shaffer* at ¶ 17, quoting *Tims v. Tims*, 22 Ohio C.D. 506, (1911). (Other citation omitted.) These acts are intended " 'to prevent the diversion of a decedent's estate from those who would take it under the statutes of descent and distribution except in instances where the decedent has clearly and deliberately

expressed an intention to so divert it.' " *Id.* at ¶ 18, quoting *Sherman v. Johnson*, 159 Ohio St. 209, 222 (1953).

{¶ 17} "If a will bears all the signatures indicating due execution and attestation, the court must admit the will to probate irrespective of whether the will's validity could be challenged on other grounds." *Id.* at ¶ 12, quoting *In re Elvin's Will*, 146 Ohio St. 448, 451-452 (1946). "The ultimate goal of will-formality requirements is to protect the testator's intent given that 'the succession process suffers from what is known as the "worst evidence" problem: decedents cannot speak up to correct the record, clarify their wishes, or protect their interests.' " *Id.*, quoting Weisbord & Horton, *Inheritance Forgery*, 69 Duke L.J. 855, 861 (2020).

{¶ 18} Concerning lost wills, R.C. 2107.26 provides as follows:

When an original will is lost, spoliated, or destroyed before or after the death of a testator, the probate court shall admit the lost, spoliated, or destroyed will to probate if both of the following apply:

(A) The proponent of the will establishes by clear and convincing evidence both of the following:

(1) The will was executed with the formalities required at the time of execution by the jurisdiction in which it was executed.

(2) The contents of the will.

(B) No person opposing the admission of the will to probate establishes by a preponderance of the evidence that the testator had revoked the will.

{¶ 19} Regarding will contests, R.C. 2107.71(A) states that: "A person interested in a will or codicil admitted to probate in the probate court that has not been declared valid by judgment of a court pursuant to division (A)(1) of section 5817.10 of the Revised Code may contest its validity by filing a complaint in the probate court in the county in which the will or codicil was admitted to probate."[2]  R.C. 2107.74 further provides that in any trial of a will contest, "the order of probate is prima-facie evidence of the attestation, execution, and validity of the will or codicil."  "Once the presumption of a will's validity arises, the burden of proof shifts to the will contestants to prove, by a preponderance of the evidence, that the will is invalid."  *Buffenbarger v. Estate of Meyer*, 2023-Ohio-2760, ¶ 31 (4th Dist.), citing *Stanek v. Stanek*, 2019-Ohio-2841, ¶ 35 (2d Dist.).  (Other citations omitted.)

## B.  Discussion

{¶ 20} In light of the above law, the posture at trial of the will contest action was that the court's prior order admitting Stanley's "lost will" was prima facie evidence of its validity.  " 'Prima facie evidence' is not conclusive.  The term denotes evidence which will support, but not require, a verdict in favor of the party offering the evidence."  *Krischbaum v. Dillon*, 58 Ohio St.3d 58, 64 (1991).  "The statutory presumption of validity, being rebuttable, shifts the burden of persuasion upon the contestants in an action to contest a will that has been admitted to probate."  *Id.*  "To rebut the

---

[2] R.C. 5817.10(A)(1) does not apply here, as the trial court had, in the estate case, only admitted the "lost will" of Stanley pursuant to R.C. 2107.03 and R.C. 2107.26.  *See* Admission Dec., p. 22.  The court did not make findings on the other matters required in R.C. 5817.10(A)(1), such as undue influence, fraud or mistake, and so forth, as is required.

presumption, the person contesting the will must produce evidence that furnishes a reasonable basis for sustaining the claim." *Ayer v. Morenz-Harbinger*, 2020-Ohio-6861, ¶ 31 (1st Dist.), citing *Estate of Snell v. Kilburn*, 2005-Ohio-7076, ¶ 10 (7th Dist.), and *Kata v. Second Natl. Bank of Warren*, 26 Ohio St.2d 210 (1971), paragraph two of the syllabus, *overruled in part on other grounds in Krischbaum* at 64, fn. 9.

{¶ 21} After reviewing the record, we conclude that Brandy met the required burden of producing evidence to rebut the presumption of the will's validity and that she established by a preponderance of the evidence that the will was invalid. We normally accord weight to conclusions of triers of fact because they have the best opportunity to hear and see witnesses and judge credibility. *E.g., Seasons Coal Co. v. City of Cleveland*, 10 Ohio St.3d 77, 80 (1984). However, this case is not about credibility, and we afford the trial court no deference on that ground. Nonetheless, simply as background, we will include some factual information.

{¶ 22} As noted, the court held bench trials on two occasions. The first trial involved the application to admit the alleged lost will, and the court heard testimony from two credit union employees, some family members, and the estate's administrator. During the second trial, which involved the will contest, the court heard additional testimony from Curtis and Brandy, who had both also testified at the first trial.

{¶ 23} The dispute here was over disposition of a 90-acre farm in Tennessee that originally had belonged to Stanley's parents, who moved there in 1980 when Mr. Rogers retired from the Air Force. The family consisted of Mr. and Mrs. Rogers and five children (in order from eldest to youngest: W.R. (aka C.R.); Curtis; Stanley; Harlan; and S.R.).

The bulk of the land had come from Mrs. Rogers's family, and three or four acres had belonged to Mr. Rogers's family. Curtis lived at the farm for about a year after the family moved to Tennessee, and he then entered the Air Force. *Id.* All the other brothers (W.R., Stanley, and Harlan) entered the military as well, and the family did not keep in close touch, because the brothers were "scattered to the wind" during their careers. The only brother who ended up in Tennessee was W.R.; the others ended up in Ohio (Stanley), Virginia (Curtis), and Florida (Harlan). Transcript of Proceedings (Bench Trial) (Apr. 18, 2023) ("Tr. 1"), 39-42, 115, and 125.

{¶ 24} According to Curtis and Harlan, their parents wanted the farm to be divided among the five children. Mr. Rogers died in 2017, and Mrs. Rogers died in November 2022, while the application to approve the lost will was pending. *Id.* at 44, 47, and 137. Previously, at some point in 2014, Mr. and Mrs. Rogers had signed a deed transferring the Tennessee property to Stanley. According to Curtis, Stanley had stopped at the farm on the way back from a Florida visit and noticed that Mrs. Rogers was driving while intoxicated. Stanley was concerned that the farm could be lost due to a lawsuit and, in Curtis's view, persuaded Mrs. Rogers to sign the property over to him. Stanley called Curtis and told him what he had done. At that time, Curtis (an attorney licensed in Virginia) told Stanley that was not the way it should have been done, that Stanley should have asked their mother to transfer the property into all the siblings' names, and that Stanley could take care of it by signing a quit-claim deed. *Id.* at 49-50.

{¶ 25} The discussion between Curtis and Stanley began cordially but eventually deteriorated. On September 11, 2014, Stanley sent an email to Curtis titled, "Last Will

and Testament (Stanley Rogers, dated 11 Sept 2014)." The email had an attached PDF, and Stanley stated in the body of the email that "the attached updated 'Last Will and Testament' document should keep family-things secure until further rework." *Id.* at 13 and Joint Ex. 2.

{¶ 26} The document itself consisted of the following two pages:

Probate Court of Montgomery County, OH
E-Filed - Apr 17 2023 8:52 AM
2021EST00793

Redacted Copy
# LAST WILL AND TESTAMENT OF

## Dr. STANLEY ROGERS, Colonel USAF Reserves

I, **Stanley Rogers**, an adult residing at _935-L Wilmington Avenue, Dayton Ohio, 45420, being of sound mind, declare this to be my Last Will and Testament. I revoke all wills and codicils previously made by me.

### ARTICLE I

I appoint **Curtis McClendon Rogers** as my Personal Representative to administer this Will, and ask that he/she be permitted to serve without Court supervision and without posting bond. If **Curtis M. Rogers** is unwilling or unable to serve, then I appoint **Harlan Franklin Rogers** to serve as my Personal Representative, and ask that he be permitted to serve without Court supervision and without posting bond.

### ARTICLE II

I direct my Personal Representative to pay out of my residuary estate all of the expenses of my last illness, administration expenses, all legally enforceable creditor claims, all Federal estate taxes, state inheritance taxes, and all other governmental charges imposed by reason of my death without seeking reimbursement from or charging any person for any part of the taxes and charges paid, and if necessary, reasonable funeral expenses, including the cost of any suitable marker for my grave, without the necessity of an order of court approving said expenses.

### ARTICLE III

I devise, bequeath, and give my _ **Land/Property to my remaining siblings (Brothers: 3/4th Part) and two daughters (Jasmine Monique Rogers & Brandy Alexandria Rogers: 1/4th Part)**.

### ARTICLE IV

I devise, bequeath, and give all of the rest and remainder of my residuary estate as follows:

a. __50__ % to __Jasmine Monique Rogers (upon her mother's Death)__.
b. __50__ % to __Brandy Alexandria Rogers (upon her mother's Death__.

### ARTICLE V

Should any beneficiary not survive me by 30 days, his or her share shall be distributed to his or her then surviving children in equal shares.

YOUR NAME

EXHIBIT

**A**

Probate Court of Montgomery County, OH
E-Filed - Apr 17 2023 8:52 AM
2021EST00793

## SELF-PROVING AFFIDAVIT

This instrument, consisting of this and two (2) typewritten pages, was signed and acknowledged by Testator/Testatrix as his Last Will and Testament in our presence, and we, at his/her request, and in his/her presence, and in the presence of each other, have subscribed our names as witnesses.

Under penalties for perjury, we, the undersigned Testator/Testatrix and witnesses declare:

1. That the Testator/Testatrix executed this instrument as his Will;
2. That in the presence of witnesses, the Testator/Testatrix signed or acknowledged his signature already made, or directed another to sign for him in his presence;
3. That the Testator/Testatrix executed the Will as his free and voluntary act for the purposes expressed in it;
4. That each of the witnesses, in the presence of the Testator/Testatrix and of each other, signed the Will as witness;
5. That the Testator/Testatrix was of sound mind; and
6. That, to the best of his/her knowledge, the Testator/Testatrix was at the time eighteen (18) or more years of age.

All of which is attested to this 11th day of September 2014.

SPANLEY ROGERS

_____
YOUR NAME, Testator/Testatrix

_____
Witness

Craig Howard
_____
Witness

Debra L. Fuller
Notary Public, State of Ohio
My Commission Expires 12-01-2018

Tr. 1 at 13 and Joint Ex. 1. (The exhibit was referenced in the trial court both as Ex. A and Joint Ex. 1, and was admitted as Joint Ex. 1.)   *See* Tr. 1 at 51, 55, and 147.

{¶ 27} After receiving the "will" document in September 2014, Curtis told Stanley he objected.   Curtis "blew off" the will and told Stanley that was not what needed to happen.   Their communication was mainly by phone; however, after Stanley stopped taking Curtis's calls, they communicated via email, with the first email being on December 30, 2014.   Each time they communicated, Curtis encouraged Stanley to make the proper transfer.   During their conversations, Stanley and Curtis discussed Stanley's concern about W.R., who was an alcoholic, and the potential for a lawsuit, as with their mother. W.R. had also filed a Chapter 13 bankruptcy in December 2014.   In addition, they discussed potential Medicaid waivers concerning their sister, S.R., who was disabled. Stanley initially delayed, and when it appeared Stanley was not going to do what was asked, Curtis became more aggressive and strident.   Stanley then stopped talking to Curtis and stopped communicating with the family.   In Curtis's words, Stanley "disowned the family."   Tr. 1 at 51-53, 64-66, and 91-93; *see also* Joint Ex. 2.

{¶ 28} At trial, Curtis testified that after the initial September 2014 conversations about the will, he eventually "forgot" about it and did not remember the copy of the will until he was in Tennessee for the funeral of his uncle, who died on June 15, 2022.   At that time, Curtis and his brother, Harlan, were talking about the situation, and Curtis recalled that Stanley had sent him a copy of the will.   Consequently, Curtis searched his email to see if he could find it.   *Id.* at 53; *see also* Transcript of Proceedings (Bench Trial)

(Feb.27, 2024) ("Tr. 2"), 27.

{¶ 29} On the other hand, Curtis also testified that an implication had arisen that Stanley had deceived or tricked their parents. Curtis was so convinced of this that he encouraged his mother to bring a lawsuit against Stanley to invalidate the deed and offered to serve as legal counsel. However, she did not want to do that. Tr. 1 at 87-88. Over the years, Stanley financially contributed to property improvements on the farm, including installation of a deck, HVAC system, new flooring, and a new concrete driveway; Stanley furnished money for these projects, and the other brothers provided labor. *Id.* at 88-89 and 169.

{¶ 30} The last communication between Stanley and Curtis was a January 5, 2015 email from Stanley about the property, to which Curtis did not reply. Even when their father's funeral was held in 2017, Stanley came only to the back of the church and did not speak to anyone. He also did not come to his mother's home after the funeral. Stanley and Curtis did not communicate after the January 2015 email until Stanley was in the hospital in January 2021. Because Curtis was listed as next of kin at the hospital, and Stanley was in the ICU and was not lucid, the hospital called Curtis to obtain his permission to perform a procedure. During that hospitalization, a nurse put Stanley on the phone with Curtis, who offered to come to Dayton. However, Stanley declined, saying he thought he would get better. They did not discuss the property. Stanley died on January 15, 2021, and Curtis learned about the death when Stanley's daughter, Jasmin, called him. Curtis then drove to the hospital, collected Stanley's belongings, went to Stanley's apartment, and began to go through Stanley's property. He was the

first person who entered the apartment. *Id.* at 67-69, 96-97, 99, 101, and 166-167; Joint Ex. 2.

**{¶ 31}** The apartment was in bad shape and looked like a hoarder lived there. Curtis cleaned it up and collected a lot of paperwork to see if a will was in there, but he never found one. Curtis also opened a storage unit in his own name and put some of Stanley's things in there. Curtis was in Dayton (and in the apartment) for about a week at that time. *Id.* at 70-71; Tr. 2 at 31. At some point, Curtis assisted Jasmin in finding legal counsel in Montgomery County, and the estate case was filed on April 4, 2021. Tr. 1 at 101.

**{¶ 32}** When Jasmin subsequently entered Stanley's apartment with the estate attorney's paralegal, she found a fire safe box that was open and empty in the path where Curtis had cleaned. There was no original will in the safe. The apartment also contained lots of paperwork, including documents dating back to the 1980s, old bank records, tax returns dating back more than seven years, orientation documents from Stanley's first job, and all the paystubs for every job Stanley had ever had. No copy of a will or original will was ever found in the apartment, in Stanley's office at Wright Patterson Air Force Base, or in storage units Stanley had in Dayton and Tennessee. *Id.* at 164-166, 177-178, and 190-191; Tr. 2 at 59-62.

**{¶ 33}** As indicated, Curtis located the copy of the alleged will in late June 2022; he then forwarded it to the estate's attorney, who filed the application to admit a lost will in August 2022. Sometime later, Curtis received a box of documents from Stanley's duty station, but no will was in the box. Tr. 1 at 57; Tr. 2 at 44.

**{¶ 34}** In addition to the dysfunctional relationship with his siblings, Stanley had troubled relationships with his daughters, who had different mothers and had never been in his custody. Jasmin had been very close to Stanley until she was 14 years old. At that time, Stanley became upset when Jasmin wanted to alter her visitation schedule. As a result, he never spoke to her again. Brandy had also been quite close to her father, particularly during her college years, when she attended his alma mater and majored in engineering, as he had. During that time, they had a rift but then began to reconnect. Brandy stated that she had communicated with Stanley on a somewhat regular basis until he died. (Both girls were in their early thirties at the time of the April 2023 trial.) Tr. 1 at 158-159, 173, 183-189, and 208.

**{¶ 35}** The credit union employees who had witnessed the will testified at the April 2023 trial. Neither had any recollection of the encounter, but they outlined the procedures they normally used and said they would have followed those procedures. Both witnesses also said they would have read the document carefully before signing. In addition, they identified their signatures on the document. *Id.* at 20, 22-27, and 28-36.

**{¶ 36}** In its decision on the will contest, the trial court rejected Brandy's claim that the will was invalid because it was not signed at the end. In this regard, the court stated that a decedent need not sign a will at the end if the signature comes at the end of dispositive parts of the will. Contest Dec., p. 26. Furthermore, the court rejected any argument about the fact that one page of the will was missing, due to the court's reliance on "metadata." *Id.* According to the court:

> In the Lost Will hearing, evidence was presented that at the time

Decedent scanned Stanley's will to himself, on September 11, 2014 (the same day as its execution), the Will was only two pages total. The metadata contained in the Adobe PDF file corroborated the two-page document was scanned as a single electronic file. It is irrefutable that Stanley scanned the two-page Will to himself and later that day emailed that same two-page document to Curtis, which is Stanley's Last Will. The Court also notes not only did Stanley sign the Will "at the end" of page one, he also signed the Will "at the end" of page two. See below. There are no dispositive provisions after Stanley's signatures.

(Emphasis in original). *Id.*

{¶ 37} Regarding signing wills, in 1905, the Supreme Court of Ohio considered a probate statute that is essentially the same as current R.C. 2107.03 (which we quoted above). That statute provided, in relevant part, that: " 'Every last will and testament . . . shall be in writing, and may be hand written or typewritten, and such will shall be signed at the end thereof by the party making the same, or by some other person in his presence and by his express direction, and shall be attested . . .' " *Irwin v. Jacques*, 71 Ohio St. 395, 403 (1905), quoting R.S. 5916. In *Irwin*, the scrivener had written down various will provisions, including the attesting clause, and read them to the testator, who said he was satisfied. However, the testator refused to sign until another dispositive provision was added. The scrivener then added this provision in the left side margin of the will, and the testator signed the will under the attesting clause. The will was also signed by two witnesses. *Id.* at 402-403.

{¶ 38} On appeal, the Supreme Court of Ohio found that, while the facts were undisputed about insertion of the provision before signing and that the testator had intended it to be part of the will, the will was not properly signed "at the end" as the statute required. In this regard, the court stated that:

> The statute (section 5916) prescribes the formalities to be observed in the execution of a will, and we think the intention of the Legislature, as thus expressed, is very plain. The history of this and similar legislation evinces a purpose that such dispositions of property, real or personal, should be so executed as to prevent, as far as practicable, unauthorized and fraudulent additions and interlineations before or after the execution of the will. There should be some continuity in the expression of the testator's wishes, and, if a part of the will is aside from the continuity of the language, such as the marginal matter in this case, there should be some word or character used as a reference to the place it should occupy in relation to the other provisions, so that the end of the will may be ascertained.

*Irwin* at 407. Therefore, the court affirmed the lower court judgment finding the will invalid. *Id.* at 409.

{¶ 39} Interpreting the same statute, the court again agreed that a will was invalid in *Sears v. Sears*, 77 Ohio St. 104 (1907). In that case, the testator filled out a pre-printed will form and placed her name in the attestation clause rather than on the line provided for attestation. After the will was admitted to probate, it was challenged, and the trial court directed a verdict in favor of the parties challenging the will. On appeal,

the Supreme Court of Ohio discussed in detail the history of requiring signatures at the end of wills and then agreed with the trial court's decision. *Id.* at 119-128.

{¶ 40} Among other things, the Supreme Court of Ohio noted that, although wills had earlier been required to be in writing and signed, it was not until 1840 that Ohio wills also had to be signed at the end. The court remarked that "[t]his requirement is assumed to have been suggested by the English statute of wills, passed in 1837." *Id.* at 119. After considering that statute and cases in other states, which required statutory compliance to prevent fraud, the court commented that the question was what the testator did, not what she intended to do. *Id.* at 128.

{¶ 41} Further, the court stressed that while the statute governing wills provided that "the order of probate shall be prima facie evidence," "the Legislature did not contemplate that a will not signed, or not signed at the end thereof, or not witnessed, ever would be ordered to be probated, and so the matter is not controlled by the statute." *Id.* at 128. The court continued, stating, "It was assumed that the end of the will was self-evident, and the statute was adopted in order to leave no room for the abuses and litigation that had been invited by the efforts of the courts to give effect to the intentions of testators." *Id.* at 128-129. The Supreme Court of Ohio, therefore, stated in the syllabus that: "In the interpretation of the statute regulating the execution of wills the intention of the Legislature controls, and a will that is not executed as required by statute is invalid, notwithstanding the intention of the testator." *Id.* at 104.

{¶ 42} Another example occurred in *Chandler v. Dockman*, 29 Ohio C.D. 405 (2d Dist. 1917), in which a two-page will was held together with brads or fasteners, and the

last page, where the testator signed, was incorrectly fastened in front of the first page. *Id.* at 406. In that situation, and given the will's content, the court of appeals found that it clearly appeared the testator had signed at the end of the document. *Id.* at 407-408. In contrast, in another case, the court of appeals concluded an alleged will was invalid, i.e., not signed at the end, where a dispositive clause appeared after the testator's signature. *In re Estate of Metz*, 2006-Ohio-4809, ¶ 17-18 (6th Dist.).

**{¶ 43}** In the case before us, it is true that Stanley signed the will at the end of page one and also signed what was labeled as a "self-proving affidavit." The Uniform Probate Code ("UPC") provides for self-proving affidavits, and some jurisdictions have adopted that provision. *E.g., In re Estate of Stephens*, 9 Neb.App. 68 (Neb.App. 2000). In *Stephens*, the court noted that "[t]he purpose of the self-proved provision in § 30-2430 is to expedite formal testacy proceedings." *Id.* at 74, citing *In re Estate of Flider*, 213 Neb. 153 (1982). The court of appeals further observed that: "The Nebraska Supreme Court has stated that a self-proved will may not be contested in regard to signature requirements but that the formal requisites for execution of the will must appear, either preceding the self-proving affidavit or as supplemental in the affidavit." *Id.*

**{¶ 44}** Additionally, the court noted that "Section 30-2430 was adopted from the Uniform Probate Code. The comment in the Uniform Probate Code provides that the ' "conclusive presumption" described here would foreclose questions like whether the witnesses signed in the presence of the testator. It would not preclude proof of undue influence, lack of testamentary capacity, revocation or any relevant proof that the testator was unaware of the contents of the document.' " *Id.* at 74-75, quoting Uniform Laws

Annotated, § 3-406 at 85 (1998). Here, there is no claim that Ohio has adopted this part of the UPC. Therefore, the fact that Stanley and the witnesses signed a self-proving affidavit has no particular significance in that regard.

{¶ 45} Despite Stanley's signatures, the proffered "lost" will has only two pages. As noted above, the first page is labeled "Last Will and Testament of Dr. Stanley Rogers, Colonel USAF Reserve" and contains Articles I through V, followed by Stanley's signature. The second page is labeled "Self-Proving Affidavit." Under that heading, the document clearly states that: "This instrument, *consisting of this and two (2) typewritten pages*, was signed and acknowledged by Testator/Testratrix as his Last Will and Testament in our presence, and we, at his/her request, and in his/her presence, and in the presence of each other, have subscribed our names as witnesses." (Emphasis added.) This statement is followed by several declarations, like the fact that Stanley had signed the will of his own free will, that he was of sound mind, and so forth. The signatures of Stanley and the witnesses followed. *Id*. at Joint Ex. 1.

{¶ 46} However, the second page of the will was missing, and there is no way to tell what the contents of that page might have been. It is possible, of course, that typographical errors were made, and the will had only two pages. It is equally possible that the will had a second page containing dispositive provisions. According to Curtis, the first page, signed by Stanley, contained all the necessary dispositive provisions. However, this was simply speculation.

{¶ 47} The trial court appears to have resolved this issue by resorting to "metadata," as discussed above. "Metadata is '[s]econdary data that organize, manage,

and facilitate the use and understanding of primary data.' " *State ex rel. McCaffrey v. Mahoning Cty. Prosecutor's Office*, 2012-Ohio-4246, ¶ 19, quoting *Black's Law Dictionary* 1080 (9th Ed. 2009). "In other words, it is '[i]nformation describing the history, tracking, or management of an electronic file * * *.' " *In re A.F.*, 2020-Ohio-4622, ¶ 26, fn. 2 (3d Dist.), quoting *Townsend v. Ohio Dept. of Transp.*, 2012-Ohio-2945, ¶ 21 (10th Dist.).

**{¶ 48}** The parties did not raise this issue, however. Instead, the trial court raised it following Curtis's direct testimony on April 18, 2023. At that point, the court asked Curtis if the copy of the will he sent to the estate's attorney was a PDF, and Curtis replied that he believed it was. The court then asked Curtis if he knew what "metadata" was and whether it had been checked. Tr. 1 at 105. In response, Curtis offered to pull up the document on his phone. However, the court declined, stating, "I really don't [want you to] because I don't like looking through people's phones. But I was just curious if you did." *Id.* at 105-106.

**{¶ 49}** During Harlan's testimony, the court also asked Harlan if he knew what metadata was and if he had checked it. *Id.* at 141. In response, Harlan remarked that there was no way to tamper with military email (due to use of a chip card to access the email system). At that point, the court noted it was not asking about email security, stating: "What I'm really looking for is if you looked at that PDF – and I don't know how it comes across, especially with the authentication factor – whether anybody looked at the properties of that document and saw it was scanned in 2014, or generated in 2014. Just curious." *Id.* at 141-142.

**{¶ 50}** At the end of the April 18, 2023 hearing, i.e., after the court's remarks,

Brandy's attorney called the administrator's attorney (Cassandra Rice) as a witness. Rice said that after the metadata discussion occurred, she had contacted her office because she could not locate the metadata using her personal iPad. *Id.* at 211. As a result, Rice asked her personal assistant to look at the metadata from the email Brandy had forwarded to Rice.[3] Rice's assistant had then shared the metadata with Rice via a "screenshot." *Id.* at 212. From the screenshot, Rice was able to see that the document Stanley sent to Curtis was a "hard copy, which indicated that it was a scanned document," and that "the scan was created on or about September 11th 2014." *Id.*

{¶ 51} The following exchange then occurred:

[Rice]: . . . I know it [the screenshot] reflected the time that the scan was created, and I can report that to you if you allow me to look at the screenshot.

. . .

A. Okay. And for the record, I'm looking at my IPad in my – my personal work email. Under the document properties tab of the PDF document, it indicates as a title that is a scanned document. It was created on 9/11/2014, at 3:55 and 33 seconds p.m. It indicates the page size, which is 8.5 by 11 inches. It indicates the number of pages, which is two. Let's see – I – it indicates that the PDF producer was Lexmark x792, the PDF version is 2/5 parens Acrobat 6.x.

---

[3] We interpret this to mean that Curtis had apparently sent Stanley's 2014 email (with the attached alleged will) to Brandy, and Brandy had then forwarded Curtis's email to Rice.

When I navigate to the additional document properties tab, it indicates some of the same information; and additionally indicates the application is a hard copy."

Tr. 1 at 212-213.

{¶ 52} Following these statements about the metadata, Rice was asked the date of the email that was sent to Curtis (with the will attached); she responded that "The email appears to state a date of Thursday, September 11th, 2024, at 4:01 p.m. . . . I meant 2014." *Id.* at 213. Again, from this, the trial court concluded that the original will must have had only two pages.

{¶ 53} There are many difficulties with what occurred here. Under Evid.R. 614(B), a "trial court may interrogate witnesses, in an impartial manner, whether called by itself or by a party." "Typically, 'in the absence of any showing of bias, prejudice, or prodding of a witness to elicit partisan testimony,' we presume that trial courts act impartiality by asking questions from the bench, to learn material facts or develop the truth." *Easterling v. Easterling*, 2001 WL 369734, *2 (2d Dist. Apr. 13, 2001), quoting *Jenkins v. Clark*, 7 Ohio App.3d 93 (2d Dist.1982), and citing Evid.R. 614(B). Despite this presumption, we stressed in *Easterling* that "suggesting a legal claim not mentioned at trial by a party's own attorney comes perilously close to 'prodding a witness to elicit partisan testimony.' Specifically, if an issue has not even been raised at trial, there can be no material truth or fact to be developed on the point." *Id.* Applying that principle here, no party had mentioned metadata or any theories about metadata; thus, there was no material truth or fact to be developed on that point.

{¶ 54} As an additional matter, the trial court did not admit the "screenshot" into evidence; therefore, it is impossible to review the evidence on which the court appears to have relied. More importantly, no evidence was submitted about what metadata is and how it works. In fact, the court recognized in the hearing that its knowledge about metadata and authentication may have been limited. Tr. 2 at 141-142.

{¶ 55} Finally, even if this were otherwise, there was no foundation for the court's conclusion, based on the metadata, that the will was only two pages when it was scanned. Contest Dec. at p. 26. Using a scanner and creating a "PDF" does not mean the scanned material is the actual or total document that existed before the scan.

{¶ 56} For example, a person could choose to include some or all of a document to be scanned. Specifically, scanners are not always attached to individual computers; instead, offices may have scanners used in common by various people. A party may take any number of printed or copied pages to a scanner, manually scan them in to create a PDF, and then send the PDF to an email address, including that party's own address. (This process appears to be what the trial court referred to when it stated that Stanley "sent the two-page will to himself," although there was no actual proof about that.) Contest Dec. at 26.

{¶ 57} In addition, while Rice's testimony identified the PDF "producer" as a "Lexmark" (presumably a scanner or perhaps a copier/scanner), there was no indication of how the document was scanned or of the Lexmark's location. Clearly, the scanner could have been attached to Stanley's computer; it could also have been a common scanner. Even if the former situation applied, there is simply no evidence to indicate how

the alleged "lost" will was scanned.

{¶ 58} A Portable Document Format or PDF is "[a] file format technology developed by Adobe Systems to facilitate the exchange of documents between platforms regardless of originating application by preserving the format and content." The Sedona Conference Glossary: *Ediscovery & Digital Information Mgt., Fifth Edition, A Project of the Sedona Conference Technology Resource Panel*, 21 Sedona Conf. J. 263, 353 (2020). "Scanning a document to .pdf or .tiff eliminates metadata as well unless the metadata is displayed when the document is scanned." The Sedona Conference®, *Commentary on Ethics & Metadata*, 14 Sedona Conf. J. 169, 190 (2013).

{¶ 59} There is no evidence that the metadata from an original document was displayed on the two pages of the alleged will when it was scanned. Specifically, what this would mean is that information about the original composition would have been displayed; instead, what was established here was simply the time the scan occurred and the PDF was created, i.e., 3:55 and 30 seconds p.m. on September 11, 2014. Clearly, the original will document could not have been "created" at that time, because Stanley sent the PDF (which included the self-proving affidavit signed by credit union employees) to Curtis only about five minutes later (at 4:01 p.m.).

{¶ 60} As noted, metadata tracks the history of an electronic file, but the file being tracked here was a PDF, not an original electronic (or "native") file. A "Native Format" is defined as follows: "Electronic documents have an associated file structure defined by the original creating application. This file structure is referred to as the native format of the document. Because viewing or searching documents in the native format may require

the original application (for example, viewing a Microsoft Word document may require the Microsoft Word application), documents may be converted to a neutral format as part of the record acquisition or archive process." *Ediscovery & Digital Information Mgt.* at 340. Such a neutral format would be a PDF or other format that is not the native format. Again, if the metadata is not displayed when a native document is scanned to PDF, the metadata will be eliminated.

{¶ 61} It is quite possible that Stanley chose to scan only the first and third pages and created a PDF of just those two pages. The most that can be said of the testimony about the metadata is that someone (most likely Stanley) scanned in two pages at 3:55 p.m. on September 11, 2014, and then Stanley emailed those two pages to Curtis several minutes later at 4:01 p.m. Perhaps Stanley felt there were other will contents that he did not need to share with Curtis and believed what he sent was sufficient; perhaps the alleged will actually only had two pages. However, conclusions either way are merely speculative. The plain evidence in the document itself is that it consisted of *two typewritten pages* plus the third page, "the self-proving affidavit." Consequently, the will was invalid, since an entire page was missing, and it could not be said that Stanley had signed at the end of the will. No one can know what the missing page contained.

{¶ 62} In its decision, the trial court also rejected the administrator's argument that the will could not be admitted to probate because it failed to meet the formal requirements of R.C. 2107.03. As support for this conclusion, the court relied on R.C. 2107.24. Contest Dec. at p. 31. In this regard, the court essentially found that, because it had already concluded that the will should be admitted under R.C. 2107.03, the will therefore

automatically qualified to be admitted under R.C. 2107.24. According to Brandy, the trial court could not rely on R.C. 2107.24 because it failed to hold a hearing as required by the statute. Brandy's Brief, p. 11. Brandy also notes that Curtis never applied to admit the will under this statute and further contends that the trial court improperly raised the issue sua sponte in ruling on Brandy's summary judgment motion. *Id.* at p. 11-12.

**{¶ 63}** Under R.C. 2107.24:

(A) If a document that is executed that purports to be a will is not executed in compliance with the requirements of section 2107.03 of the Revised Code, that document shall be treated as if it had been executed as a will in compliance with the requirements of that section if a probate court, after holding a hearing, finds that the proponent of the document as a purported will has established, by clear and convincing evidence, all of the following:

(1) The decedent prepared the document or caused the document to be prepared.

(2) The decedent signed the document and intended the document to constitute the decedent's will.

(3) The decedent signed the document under division (A)(2) of this section in the conscious presence of two or more witnesses.

**{¶ 64}** "The standards of R.C. 2107.24 provide a narrow exception to the formalities required in R.C. 2107.03, *primarily by excusing a witness's failure to sign the will.*" (Emphasis added.) *Shaffer*, 2020-Ohio-6973, at ¶ 13, citing Frank, *Harmless*

*Error, or Not? Applying R.C. 2107.24*, 17 Ohio Prob.L.J. 38 (2006). "If the document submitted to probate does not satisfy the requirements described in R.C. 2107.03, subject to the narrow exception in R.C. 2107.24, then the document is simply not a will." *Id.*, citing *Bloechle v. Davis*, 132 Ohio St. 415, 418 (1937). Notably, "[t]he court's role at the point of admission to probate is not to examine the validity of the will's contents but to verify that the document was validly executed." *Id.*, citing *In re Hathaway's Will*, 4 Ohio St. 383, 386 (1854).

{¶ 65} In the case before us, the trial court had already admitted the will to probate by finding it complied with R.C. 2107.03. Furthermore, *Curtis did not ask the court to admit the will under R.C. 2107.24.* Instead, his application was for admission of the will as a lost, spoliated, or destroyed will under R.C. 2107.26. Under that section, the proponent of the will is required to establish two things by clear and convincing evidence: "(1) The will was executed with the formalities required at the time of execution by the jurisdiction in which it was executed"; and "(2) The contents of the will."

{¶ 66} "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶ 67} Again, admitting a will to probate simply creates a statutory presumption that can be rebutted if the party contesting the will produces "evidence that furnishes a reasonable basis for sustaining the claim." *Ayer,* 2020-Ohio-6861, at ¶ 31. Because

the trial court's initial admission of the "lost" will was not immediately appealable, Brandy had no opportunity to challenge on appeal the trial court's initial decision to admit the will, i.e., whether Curtis had satisfied the statutory requirements in R.C. 2107.26(A).

{¶ 68} In its initial decision admitting the "lost" will, the trial court found by clear and convincing evidence that the will's contents were proven. The decision was based, again, on the testimony about the PDF and metadata, which established, in the court's opinion, that the will was always only two pages and could not have been altered. Admission Dec. at p. 17-18. Therefore, the court discounted the missing page. *Id.* We have already found that the will did not meet the statutory requirements for execution, i.e., signing at the end, and the same conclusion also applies to the second requirement in R.C. 2107.26(A). Because a page was missing from the will, Curtis clearly could not prove the will's contents.

{¶ 69} As noted, after we dismissed Brandy's appeal from the court's decision on admission of the lost will, Brandy filed a separate will contest action as is required to contest admission of a will to probate. The trial court then consolidated all the cases. As we also observed, Brandy filed a summary judgment motion, which the trial court denied. In the summary judgment decision, the court stressed its two prior findings: (1) the will complied with R.C. 2107.03; and (2) no party had established by a preponderance of the evidence that Stanley had revoked the will. Decision, Order, and Entry Denying Plaintiff's Motion for Default Judgment and Motion for Summary Judgment; Order to Consolidate (Jan. 19, 2024), p. 4, citing Admission Dec. at 14-20. In overruling the summary judgment motion, the court also remarked that even if the will failed to satisfy

the requirements of R.C. 2107.03, it should still be treated as Stanley's will pursuant to R.C. 2107.24. *Id.* at p.10. As noted, no one had raised this issue; Curtis did not even reply to the summary judgment motion.

{¶ 70} The court also did not say it would hold a hearing on this point; in fact, when the court set the bench trial for February 27, it did not even mention R.C. 2107.24. To the contrary, the court simply said the parties could "submit evidence during the trial . . . relevant to Plaintiffs' complaint, defenses, and/or counterclaims of record." Entry Setting Bench Trial (Feb. 26, 2024). However, there were no counterclaims, and as noted, Curtis never asked the court to admit the will pursuant to R.C.2107.24.

{¶ 71} Furthermore, on the day of trial, when preliminary matters were discussed, the court did not raise the potential application of R.C. 2107.24 and did not classify the trial as a hearing on that point, and the parties did not discuss it. The court just said it would treat the trial as a "supplement" to what had already occurred, rather than redoing what had been done before. Tr. 2 at 3-10. As indicated previously, only Curtis and Brady testified at this trial, which was brief.

{¶ 72} In a post-trial brief, the administrator did address the issue of R.C. 2107.24, noting, among other things, that R.C. Chap. 2107 covers various situations, including lost or spoliated wills in R.C. 2107.26; non-compliant wills in R.C. 2107.24; and oral wills in R.C. 2107.60. Administrator's Post-Trial Brief, p. 13, filed on August 30, 2024. The administrator further commented that Ohio does not recognize holographic wills or self-proved wills. *Id.* In addition, the administrator stressed that these statutes relax different requirements and cannot be combined. *Id.* at 13-14. Presumably, the

administrator made these remarks due to the trial court's unsolicited comments in ruling on summary judgment. However, this was not necessary. As noted, the issue was not before the court because Curtis never asked for admission of the will under R.C. 2107.24; instead, his claim for admission was based on R.C. 2107.26 as a lost will.

{¶ 73} Even if this had been otherwise, the trial court was incorrect in stating that R.C. 2107.03 does not require an original will, that the will was admitted under R.C. 2107.24 (when that was not under consideration), and that "[a]lthough there are statutory procedures for the admission of copies of wills to probate, there are other legal bases that support admission of copies of these documents to probate. *See* Ohio Rules of Evidence 901, 1003 and others, support [sic] admission of Stanley's will to probate." Contest Dec. at p. 32.

{¶ 74} Evid.R. 901(A) states that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." This rule then provides various illustrations in Evid.R. 901(B)(1)-(10). Under Evid.R. 1003, "[a] duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original."

{¶ 75} A search of Ohio cases does not reveal any situations in which courts have used the cited Ohio Rules of Evidence to avoid statutory requirements and admit copies of wills to probate. Notably, admission of wills is governed by statute. *E.g., Kronauge v. Stoecklein*, 33 Ohio App.2d 229, 230 (2d Dist.1972) ("There is no inherent or common-

law right to dispose of one's property by will. Such right depends upon statute. The law is quite specific as to the formalities required to make a valid will. . . .") Certainly, the Rules of Evidence may be used as in other situations, to decide if various evidentiary items can be admitted into evidence. That was done here, when the court originally declined to allow authentication of a photo because Curtis could not identify it, but then allowed admission after Brandy identified the photo as one she had taken. Tr. 2 at 37-38, 55-57, and 66. However, the evidence rules do not supersede statutes that govern will requirements.

{¶ 76} The proper avenue for admitting the alleged will in question here was under R.C. 2017.26, which provides for admission of lost, spoliated, or destroyed wills. In the context of this statute, " 'Lost and destroyed' are used in their popular meanings, the former referring to a will that cannot be found after a search but still may be in existence, and the latter to one that is not in existence.' " *In re Downie's Estate*, 6 Ohio Misc. 36, 38 (P.C.1966). The statute in question, R.C. 2107.26, was later amended in 1999 to its current form, but it continues to refer to an "*original*" will that is "lost, spoliated, or destroyed." *See* H.B. 59, 1999 Ohio Laws 71, eff. Oct. 29, 1999, amending 1953 H.B. 1.

{¶ 77} In the case of *In re Steel's Estate*, 8 Ohio Misc. 133 (P.C.1966), the court rejected a party's claim that a copy of a will (with the decedent's signature and signatures of witnesses intact) could be used in place of the original will, from which those items had been torn. *Id.* at 136-137. The court noted that R.C. 2107.03 refers to the fact that, other than oral wills, " 'every last will and testament shall be in writing, but may be handwritten or typewritten . . .' " and the statute, therefore, precludes "executed and

attested carbon copies." *Id.* at 137.

{¶ 78} R.C. 2107.03 has been amended in a few respects since *Steele* was decided in 1966. *See* S.B. 302, 2008 Ohio Laws 100, eff. Sept. 11, 2008, and Am. Sub. S.B. 124, 2011 Ohio Laws 52, eff. Jan. 13, 2012. However, the relevant wording still remains the same, i.e., the current version of the statute says that: "Except oral wills, every will shall be in writing, but may be handwritten or typewritten." Based on the statute's wording, the court held in *Steele* that "there can be but one original, effective, and dispositive instrument to be considered a last will and testament, and however so many copies of that original will, exact in every detail and executed by the testator and attested to by the witnesses there are, these copies remain just that; copies, copies useful to show what had existed in the case of a lost, spoliated, or destroyed will, but utterly ineffectual to be used as a substitute for the original will." *Id.* at 136. *Accord In re Scheeff*, 2007-Ohio-6081, ¶ 5-6 (8th Dist.).

{¶ 79} In *Steele*, the court also rejected a contention that the mutilated copy of the original will was a "lost will," because, again, a " 'lost will is a will that cannot be found.' " *Steele* at 138, quoting *In re Murray's Estate*, 20 Ohio N.P. (N.S.) 305 (P.C. 1917).

{¶ 80} Given the above discussion, the trial court was incorrect in claiming that an original will is not required and copies can be used instead for purposes of R.C. 2107.24. This is simply not true. R.C. 2107.26 covers situations in which the original will has been lost or destroyed and a copy can, under the specified circumstances, be admitted. R.C. 2107.24 can be used where an original will does exist but does not comply in all respects with R.C. 2107.03, such as where a witness fails to sign the will. *Shaffer*, 2020-Ohio-

6973, at ¶ 13.

{¶ 81} In light of the preceding discussion, we need not address Brandy's further arguments, which are: (1) the will was not signed by witnesses as required, since the two credit union employees did not sign at the end of the will and instead signed a self-proving affidavit rather than the will; and (2) courts in states that allow self-proving affidavits have held that the testator's signature on such an affidavit cannot cure defects in execution.

{¶ 82} Based on the preceding discussion, Brandy's first assignment of error is sustained.

## III. Revocation

{¶ 83} Brandy's second assignment of error states that:

The Probate Court Erred in Concluding That a Testator Did Not Revoke His Will When There Is Evidence of Revocation, and No Evidence to the Contrary.

{¶ 84} Under this assignment of error, Brandy argues the trial court erred in finding that Stanley did not revoke his will.   However, given our disposition of the first assignment of error, this assignment of error is moot.   Specifically, admission of the alleged lost will created a presumption of the will's validity, which may be rebutted in a will contest where the party challenging the will proves invalidity by a preponderance of the evidence.   *Ayer*, 2020-Ohio-6861, at ¶ 31; *Stanek*, 2019-Ohio-2841, at ¶ 35.   Here, Brandy established by more than a preponderance of the evidence that the alleged lost will was invalid because it failed to satisfy statutory requirements and the content could not be proven.

In light of these facts, Brandy did not have to prove that Stanley revoked the will.

{¶ 85} More specifically, R.C. 2107.26 only grants admission of a lost will if it satisfies *both* of the following requirements; (1) the proponent proves compliance with statutory formalities and the will's content by clear and convincing evidence; and (2) no person proves by a preponderance of the evidence that the will was revoked. Thus, whether Stanley "revoked" an invalid will is irrelevant. Accordingly, the second assignment of error is overruled as moot.


IV.   Public Policy

{¶ 86} Brandy's third and final assignment of error states that:

The Trial Court Erred in Considering Public Policy Goals Surrounding

the Creation and Admission of Wills to Override Statutory Requirements.

{¶ 87} Under this assignment of error, Brandy challenges several parts of the trial court's decision that consider public policy implications of the decision. In this regard, Brandy points to several places where the court purportedly inserted its opinion about public policy and relaxing will requirements. We have already discussed one such matter, i.e., the court's belief that it could apply certain evidentiary rules to avoid statutory will requirements.

{¶ 88} The law is well-established that "[i]t is not the role of the courts 'to establish legislative policies or to second-guess the General Assembly's policy choices.' " *Stetter v. R.J. Corman Derailment Servs., L.L.C.*, 2010-Ohio-1029, ¶ 35, quoting *Groch v. Gen. Motors Corp.*, 2008-Ohio-546, ¶ 212. Nonetheless, given the disposition of the first

assignment of error, we need not address this point further. Accordingly, the third assignment of error is overruled.

## V. Conclusion

**{¶ 89}** Brandy's first assignment of error having been sustained, and the remaining assignments of error having been overruled, the judgment of the trial court is reversed, and this matter is remanded to the trial court for further proceedings consistent with this opinion.

. . . . . . . . . . . . .

EPLEY, P.J. and LEWIS, J., concur.